FILED

11/12/2024

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0560

DA 23-0560

IN THE SUPREME COURT OF THE STATE OF MONTANA

2024 MT 270

LAURA MARIE OBERT,

     Plaintiff and Appellant,

v.

STATE OF MONTANA, and CORY SWANSON,
Broadwater County Attorney,

     Defendants and Appellees.

APPEAL FROM:   District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. BDV-2022-245
Honorable Michael F. McMahon, Presiding Judge

COUNSEL OF RECORD:

     For Appellant:

          Kyle W. Nelson, Henry J.K. Tesar, Goetz, Geddes & Gardner, P.C.,
Bozeman, Montana

          Brian K. Gallik, Gallik & Bremer, P.C., Bozeman, Montana

     For Appellee:

          Patricia Klanke, Kale Guldseth, Drake Law Firm, P.C., Helena,
Montana

               Submitted on Briefs:  July 10, 2024

                         Decided:  November 12, 2024

Filed:

_____
Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1      Laura Marie Obert (Obert) appeals an order from the First Judicial District Court, Lewis and Clark County, dismissing her breach of contract, bad faith, and due process claims against the State; and dismissing her malicious prosecution claim against Broadwater County Attorney Cory Swanson (Swanson).

¶2      We affirm in part, reverse in part, and remand for proceedings consistent with this Opinion.

¶3      We restate the issues on appeal as follows:

*Issue One: Did the District Court err when it in dismissed Obert's breach of contract and good faith and fair dealing claims?*

*Issue Two: Did the District Court err when it dismissed Obert's bad faith claim?*

*Issue Three: Did the District Court err when it dismissed Obert's malicious prosecution claim?*

*Issue Four: Did the District Court err when it dismissed Obert's due process claim?*

**FACTUAL AND PROCEDURAL BACKGROUND**

¶4      Obert was a Broadwater County Commissioner between 2008 and 2019.   In September 2015 Swanson asked the Montana Department of Justice Division of Criminal Investigation (DCI) to investigate concerns that Obert was unlawfully being paid overtime. Swanson also asked DCI to investigate whether Obert violated an ethics statute by voting on measures involving the Montana Business Assistance Connection, where her husband worked.  DCI agreed to investigate Swanson's concerns.  After investigating, DCI sought

prosecution of Obert for felony theft and misdemeanor official misconduct from the Office of the Attorney General.

¶5 On July 25, 2016, Obert entered a deferred prosecution agreement (Agreement) with Assistant Attorney General Brant Light (Light).[1] In an email to a DCI investigator at that time, Light explained that his inclination to pursue the deferred prosecution flowed from his belief that Obert had not intended to act deceptively or unlawfully by taking overtime pay. Likewise, Light determined that neither Obert nor her husband had received any personal financial gain from her votes on matters involving the Montana Business Association Connection, and that the alleged conflict of interest did not exist.

¶6 The Agreement required Obert to repay Broadwater County for wages she was paid beyond her statutory salary within 30 days, which she immediately paid. Additionally, under the Agreement, Obert was required to "abstain from voting on any measures or actions where she has a conflict of interest."

¶7 In July 2019, on Swanson's recommendation, the Broadwater County Commission (Commission) appointed Special Broadwater County Attorney Marty Lambert (Lambert) to pursue charges against Obert for alleged violations of the Agreement. Swanson provided Lambert with evidence indicating that Obert had breached the Agreement by failing to

---

[1] A deferred prosecution agreement, or "pretrial diversion," is an agreement between a criminal defendant and the prosecutor to defer a prosecution "for a specified period of time based on one or more of the following conditions: (i) that the defendant may not commit any offense; (ii) that the defendant may not engage in specified activities, conduct, and associations bearing a relationship to the conduct upon which the charge against the defendant is based; (iii) that the defendant shall participate in a supervised rehabilitation program, which may include treatment, counseling, training, or education; (iv) that the defendant shall make restitution in a specified manner for harm or loss caused by the offense; or (v) any other reasonable conditions." Section 46-16-130(1), MCA.

disclose a conflict of interest when she voted on the Wheatland Targeted Economic Development District (TEDD), which her husband was involved with in his work with Montana Business Association Connection.

¶8 In May 2020, Lambert charged Obert with felony theft and misdemeanor official misconduct. The felony theft charge was based on the original overpay issue, and the official misconduct charge was based on her Commission votes related to TEDD.

¶9 On March 10, 2021, the district court dismissed the charges, ruling that the Agreement prohibited the theft charge because Obert had complied with its provisions and fully paid restitution. Further, the district court also held that there was insufficient evidence to support the official misconduct charge because neither Obert nor her husband gained any personal benefit from TEDD.

¶10 The State had 20 days to appeal the district court's ruling, after which the order became final. M. R. App. P. 4(5)(b)(iii) ("An appeal from a judgment or order made appealable by section 46-20-103 must be taken within 20 days of the entry of the written judgment or order from which appeal is taken."); *Lussy v. Dye*, 215 Mont. 91, 93, 695 P.2d 465, 466 (1985) ("When the time for appeal was elapsed and no grounds justify other relief the case is final as to all matters properly appealable.").[2] The State did not appeal.

¶11 On March 28, 2022, Obert sued the State, alleging breach of contract, breach of the implied covenant of good faith and fair dealing, bad faith, and violation of her procedural

[2] As a general rule, the State may not appeal in criminal cases. *See* § 46-20-103(1), MCA. Sections 46-20-103(2) and 46-18-116, MCA, provide exceptions. *See, e.g.*, M. R. App. P. 4(5)(b)(i) (implementing § 46-18-116, MCA, wherein the State has 60 days to appeal a district court ruling on conflicts between written judgments and oral sentence pronouncements).

due process rights. On August 5, 2022, Obert filed an Amended Complaint and Demand for Jury Trial (Amended Complaint), lodging additional prosecutorial misconduct claims against Lambert and Swanson.[3]

¶12 On September 22, 2023, Obert filed a notice of appeal of the District Court order dismissing her complaint.

## STANDARD OF REVIEW

¶13 We review a district court's ruling on a motion to dismiss de novo. *Plouffe v. State*, 2003 MT 62, ¶ 8, 314 Mont. 413, 66 P.3d 316. In proceedings pursuant to Rule 12(b)(6), courts accept as true a complaint's factual allegations and view them in the light most favorable to the plaintiff. *Salminen v. Morrison & Frampton, PLLP*, 2014 MT 323, ¶ 18, 377 Mont. 244, 339 P.3d 602. "[A] complaint should not be dismissed unless it appears certain that the plaintiff will be unable to recover under any set of facts which could be proven in support of his claim." *Precision Theatrical Effects, Inc. v. United Banks, N.A.*, 2006 MT 236, ¶ 14, 333 Mont. 505, 143 P.3d 442.

## DISCUSSION

¶14 *Issue One: Did the District Court order err when it dismissed Obert's breach of contract and good faith and fair dealing claims?*

¶15 The District Court dismissed Obert's breach of contract and good faith and fair dealing claims based on its finding that the claims were time-barred, as her damages

---

[3] On Lambert's motion, the District Court dismissed Obert's case against him on September 11, 2023, for prosecutorial immunity. Lambert and Obert settled Obert's appeal of this order and we dismissed Lambert as an appellee. *See Obert v. State*, No DA 23-0560, Order (Mont. Dec. 18, 2023).

5

accrued when the State allegedly breached the Agreement—"at the latest, on May 21, 2020."

¶16 Obert argues the District Court erred because her damages did not accrue until the order dismissing the charges against her became final, which was just under one year before she filed her original complaint.

¶17 We agree with Obert that her breach of contract and good faith and fair dealing claims did not accrue until the criminal charges terminated in her favor. The District Court erred as a matter of law. We reverse on this issue.

¶18 Like plea agreements, deferred prosecution agreements are fundamentally contractual in nature; therefore, we will interpret them "in accordance with general principles of contract law." *United States v. Castaneda*, 162 F.3d 832, 835 (5th Cir. 1998); *cf. State v. Rardon*, 2002 MT 345, ¶ 18, 313 Mont. 321, 61 P.3d 132. The statute of limitation in an action against "any contracting agency of the state of Montana" is one year after "the cause of action has arisen." Section 18-1-402, MCA.

¶19 The threshold issue here is when, exactly, a civil cause of action arises when a criminal proceeding is underway that has bearing on the results of civil claims. Generally, "[a]ccrual begins at breach in a breach of contract action." *Textana, Inc. v. Klabzuba Oil & Gas*, 2009 MT 401, ¶ 35, 353 Mont. 442, 222 P.3d 580. However, in cases involving active criminal prosecutions, we find occasion to depart from the general rule.

¶20 The United States Supreme Court recently addressed a similar matter in *McDonough v. Smith*, 588 U.S. 109, 139 S. Ct. 2149 (2019). There, a special prosecutor, Smith, was appointed to investigate and prosecute a county board of elections

commissioner, McDonough, over allegations that McDonough was aware of forged absentee ballots and processed them anyway. *McDonough*, 588 U.S. at 112, 139 S. Ct. at 2153. McDonough was indicted by a grand jury, and his criminal trial ended in a mistrial. *McDonough*, 588 U.S. at 113, 139 S. Ct. at 2154. McDonough then sued Smith under 42 U.S.C. § 1983 for malicious prosecution and for fabricating evidence. *McDonough*, 588 U.S. at 113, 139 S. Ct. at 2154. A U.S. district court dismissed McDonough's malicious prosecution claim based on prosecutorial immunity, and it dismissed his fabricated-evidence claim as untimely. *McDonough*, 588 U.S. at 113, 139 S. Ct. at 2154. The Second Circuit Court of Appeals affirmed, ruling that McDonough's fabricated evidence claim was time-barred because the limitation period began to run as soon as McDonough learned that Smith fabricated evidence. *McDonough*, 588 U.S. at 113, 139 S. Ct. at 2154 (citing *McDonough v. Smith*, 898 F.3d 259, 265 (2nd Cir. 2018)). The U.S. Supreme Court reversed, holding that McDonough's claim accrued when the criminal proceedings "terminated in his favor—that is, when he was acquitted at the end of his second trial." *McDonough*, 588 U.S. at 125, 139 S. Ct. at 2161.

¶21     In reaching its conclusion, the U.S. Supreme Court analogized McDonough's fabricated evidence claim to the standard applied to a malicious prosecution claim, under which a claim may not accrue until the criminal proceeding terminates in the defendant's favor. *McDonough*, 588 U.S. at 116–18, 139 S. Ct. at 2156–57. The reasoning underlying the "favorable termination requirement" is that allowing a defendant to pursue civil claims while a criminal trial is ongoing could lead to conflicting judgments, inefficient collateral attacks on criminal judgments, and/or putting criminal defendants in the "untenable"

position of choosing between "(1) letting their claims expire and (2) filing a civil suit against the very person who is in the midst of prosecuting them." *McDonough*, 588 U.S. at 120, 139 S. Ct. at 2158. The Court held that "[b]ecause a civil claim such as McDonough's, asserting that fabricated evidence was used to pursue a criminal judgment, implicates the same concerns [as a malicious prosecution claim], it makes sense to adopt the same rule [for a fabricated-evidence claim]." *McDonough*, 588 U.S. at 118, 139 S. Ct. at 2157. Obert asserts that we should adopt *McDonough's* reasoning for her contract-based claims, too.

¶22 The State counters that *McDonough* is distinguishable because it narrowly applies to federal common law tort actions, and "Obert's contract claims in this case are not founded in federal law, but state law." The State also asserts that *McDonough* involved tort-based remedies, which are not available here because the only remedies available for "contract claims rooted in breach of a plea agreement" are recission or specific performance, which Obert enjoyed when the charges were dismissed, citing *State v. Munoz*, 2001 MT 85, ¶¶ 13–18, 305 Mont. 139, 23 P.3d 922.[4]

¶23 The *McDonough* Court, however, did not limit the relevant analysis to federal common law tort claims. The State misconstrues the following language for that premise:

---

[4] In *Munoz*, we held that "[g]enerally, when the State breaches a plea bargain agreement, one of two equitable remedies is available to safeguard a defendant's due process rights" (i.e., specific performance or recission). *Munoz*, ¶ 13. We made that statement to address a novel problem with fashioning remedies for breach of plea agreements: "whether the defendant or the sentencing judge has the right to choose the remedy." *Munoz*, ¶ 19. As Obert notes, a deferred prosecution agreement is *not* a plea agreement. The defendant does not enter a guilty plea or receive a sentence from a court based on a deferred prosecution agreement. *Munoz* addressed a unique legal question that is inapposite here.

8

> The question here is when the statute of limitations began to run. Although courts look to state law for the length of the limitations period, the time at which a § 1983 claim accrues *is a question of federal law*, conforming in general to common-law tort principles. That time is presumptively when the plaintiff has a complete and present cause of action, though the answer is not always so simple. Where, for example, a particular claim may not realistically be brought while a violation is ongoing, such a claim may accrue at a later date.

*McDonough*, 588 U.S. at 115, 139 S. Ct. at 2155 (emphasis added, internal citations and quotations omitted). The salient point is simply that state law should apply to Obert's claims because they do not involve a federal law. Here, contemporaneous civil and criminal proceedings would implicate the same concerns the *McDonough* court cautioned against. We have not previously extended the favorable termination rule to breach of contract or good faith and fair dealing claims. We adopt *McDonough's* reasoning and apply it here.

¶24 Had Obert filed a civil action before the criminal proceeding concluded, it would have frustrated comity and judicial economy that the favorable termination rule helps resolve. *McDonough*, 588 U.S. at 120–21, 139 S. Ct. at 2158–59; *see also Reed v. Goertz*, 598 U.S. 230, 237, 143 S. Ct. 955, 962 (2023). As Obert notes, the district court that presided over her criminal proceeding *did* come to different conclusions regarding the Agreement than the District Court below,[5] thus *McDonough's* concerns over conflicting

---

[5] The courts disagreed about whether Obert's restitution payment to Broadwater County meant that it could no longer pursue theft charges against her for other violations of the Agreement. *Compare Obert v. State*, Dismissal Motion Order, Cause No. BDV-2022-245, 16 (Mont. First Judicial Dist. March 16, 2023) *with State v. Obert*, Order on Motion to Dismiss, Cause No. ADC-2020-24, 12–13 (Mont. First Judicial Dist. March 10, 2021).

judgments would likely have come to fruition had Obert filed her civil claims as soon as she learned the State was prosecuting her.

¶25 Obert's breach of contract and good faith and fair dealing claims did not accrue until the dismissal of her criminal charges became final. They were dismissed on March 10, 2021. The order became final 20 days later, on March 30, 2021, after the State declined to appeal. Obert filed her original complaint on March 28, 2022, less than one year after the district court's dismissal became final. Obert's claims were not time-barred. The District Court order to dismiss these claims is reversed.

¶26 *Issue Two: Did the District Court err when it dismissed Obert's bad faith claim?*

¶27 The District Court dismissed Obert's bad faith claim based on its determination that she was not in a "special relationship" with the State when the Agreement was executed. In reaching this conclusion, the District Court opined that Obert possessed "various skills that required intellect and attention to detail such as reviewing, approving or rejecting potential contracts," and that "since the Agreement is somewhat similar to a plea agreement, . . . the mutual negotiations in securing the [Agreement] were fundamentally fair especially where both parties [were] represented by attorneys." The District Court thus ruled—as a matter of law—that Obert was not in an "inherently unequal bargaining position" compared with the State, and the requisite "special relationship" had not formed to establish a bad faith claim. The District Court further reasoned that, regardless of whether a "special relationship" had formed, Obert's bad faith claim would fail because the State never violated the Agreement, as she had a perpetual obligation while she

10

remained a voting Broadwater County Commissioner to abstain from voting on matters posing conflicts of interest.

¶28 Obert contends the District Court erred because its ruling regarding the "special relationship" was based on findings of fact that are inappropriate at the pleadings stage. Obert asserts she is entitled to bad faith damages because she *was* in a special relationship with the State based on a fundamental disparity in bargaining positions between individuals and government agencies. Obert further contends that the District Court erred in "re-opening" the prior district court ruling that the State had violated the Agreement by pursuing theft charges against Obert after she paid the agreed-upon restitution on time.

¶29 Typically, tort-type damages are not allowed in contract-based actions. *Story v. City of Bozeman*, 242 Mont. 436, 451, 791 P.2d 767, 776 (1990). We recognize an exception where "oppression in contracts . . . necessarily give[s] one party a superior position" and a plaintiff has a viable bad faith claim. *Story*, 242 Mont. at 451, 791 P.2d at 776. We look to five factors to determine whether a threshold "special relationship" exists to establish a bad faith claim:

> (1) the contract must be such that the parties are in inherently unequal bargaining positions; [and] (2) the motivation for entering the contract must be a non-profit motivation, i.e., to secure peace of mind, security, future protection; [and] (3) ordinary contract damages are not adequate because (a) they do not require the party in the superior position to account for its actions, and (b) they do not make the inferior party 'whole'; [and] (4) one party is especially vulnerable because of the type of harm it may suffer and of necessity places trust in the other party to perform; and (5) the other party is aware of this vulnerability.

*Story*, 242 Mont at 451, 791 P.2d at 776 (quoting *Wallis v. Superior Court*, 160 Cal. App. 3d 1109, 1118 (Cal. Ct. App. 1984)).

11

¶30 When a plaintiff's factual allegations are undisputed, a court may determine that a special relationship exists as a matter of law. *Story*, 242 Mont. at 451, 791 P.2d at 776. Because Obert's civil claims were dismissed at the pleadings stage, we draw solely from the facts alleged in her Amended Complaint and attachments thereto and take them as true. *See Plakorus v. Univ. of Mont.*, 2020 MT 312 n.1, 402 Mont. 263, 477 P.3d 311.

¶31 Obert alleged that a "special relationship exist[ed]" and that she and the State "were in inherently unequal bargaining positions." However, Obert was represented by competent counsel who negotiated and secured a very favorable outcome for her which did not include any criminal charges or admissions of guilt. In addition, Obert acknowledged in the Agreement "that she has reviewed the terms of this document and is entering the agreement voluntarily and freely, and that she fully understands the terms and conditions of the agreement." Finally, because a deferred prosecution agreement and a plea agreement are somewhat similar in nature, the District Court reasoned that the "mutual negotiations in securing the [Agreement] were fundamentally fair especially where both parties [were] represented by attorneys," despite Obert's plain allegation that "[Obert] and the State were in inherently unequal bargaining positions."

¶32 The facts and circumstances, as set forth in Obert's Complaint and attached documents, are not disputed and include:

- Obert was an elected county commissioner for 12 years.

- Obert "hired an attorney (Joe Seifert) to represent her" when the DCI commenced its criminal investigation.

- "Seifert spoke with Assistant Attorney General Brant Light, who was assigned to the case, about the investigation. Seifert and Light then began negotiating a

resolution." Light drafted an agreement "to which all parties agreed and signed." The Agreement was attached to Obert's Complaint.

- Light emailed John Strandell, DCI Bureau Chief, advising, "I don't believe any criminal charges were appropriate in this case when looking at the totality of the circumstances. I firmly believe the agreement addresses the concerns in Broadwater County."

- In exchange for Obert repaying wages that were in excess of her statutory salary, and agreeing to disclose conflicts of interest, the State agreed "to defer any action" regarding the investigation conducted by DCI. Obert "agree[d] to this compromise with no admission of guilt or wrongdoing."

- Obert "acknowledges that she has reviewed the terms of this document and is entering this agreement voluntarily and freely, and that she fully understands the terms and conditions of the agreement."

- The Agreement was signed by Obert and her counsel.

Justice Gustafson's Concurrence and Dissent remarks that we are inappropriately making factual findings at this stage of the proceedings. Concurrence and Dissent, ¶ 67. Rather, each of the above points comes straight from Obert's complaint. The Concurrence and Dissent fails to fully acknowledge that Obert was represented by competent counsel, who "negotiat[ed] a resolution" with Light to "defer any action" on DCI's criminal investigation. Obert's counsel exchanged draft agreements with Light, showing that there was not a mere "stock agreement" that Obert was induced to sign. Second, that Light did not think criminal charges were appropriate in a situation where Obert acknowledged that she had accepted additional hourly pay above her statutory salary does not mean that she had not violated the law and could have been prosecuted. *See* § 46-16-130(1)(a), MCA ("*Prior to the filing of a charge*, the prosecutor and a defendant . . . *may agree* to the deferral of a prosecution . . . ." (emphasis added)). Obert, through competent counsel,

13

negotiated a resolution that secured her a very favorable outcome: no criminal charges were filed against her; she did not have to admit wrongdoing; and she agreed to pay back unlawful wages and follow statutory standards of conduct that she was already beholden to as a public employee.

¶33 Other than these statements taken from the Amended Complaint, Obert alleged only that the State "unreasonably failed to first seek a judicial determination that [Obert] breached the 2016 Agreement even though it was settled law in 2020 that the government cannot unilaterally nullify a deferred prosecution agreement." However, we are holding herein that, as a matter of law, the State was not required to first seek a judicial determination that the plea agreement has been breached. *See* Issue 4. The undisputed facts within Obert's complaint, which we take as true, are not sufficient to state a cognizable claim that the parties were in an unequal bargaining position and, as such, no special relationship existed. *See Warrington v. Great Falls Clinic, LLP*, 2019 MT 111, ¶¶ 16–17, 395 Mont. 432, 443 P.3d 369 (discussing unequal bargaining power). "M. R. Civ. P. 8(a) and 12(b)(6) have liberal pleading requirements, but they do not excuse the omission of material and necessary facts that entitle relief. The complaint must state more than facts that 'would breed only a suspicion' that the claimant is entitled to relief." *Lundeen v. Lake Cnty.*, 2024 MT 120, ¶ 11, 416 Mont. 539, ___ P.3d ___ (internal citations omitted).

¶34 Here, Obert was represented by counsel in the negotiation of the Agreement. She asserts no facts that she was "faced with no option but to sign the contract." *Warrington*, ¶ 17 (internal quotation omitted). She reviewed the terms, fully understood them, and

14

voluntarily agreed to them. We hold that the parties were not in inherently unequal bargaining positions as a matter of law and affirm the District Court.

¶35 However, we are not persuaded by the State's argument that bad faith claims should be categorically prohibited in actions alleging violations of deferred prosecution agreements simply because such agreements "are not conventional [contractual] obligations." *McDaniel v. State*, 2009 MT 159, ¶ 66, 350 Mont. 422, 208 P.3d 817 (Rice, J. dissenting). At the outset, it bears emphasizing that the State's view on this matter stems from a dissenting opinion, which we are obviously not beholden to follow. In *McDaniel*, the defendant pursued a breach of contract claim against the State after it pursued a parole revocation in violation of an agreement that he had already entered with the State. *McDaniel*, ¶ 8. We reversed the district court's decision denying the defendant summary judgment, holding that the State had a "contractual obligation" not to seek parole revocation based on the agreement it entered with the defendant. *McDaniel*, ¶¶ 36, 46. *McDaniel* is inapposite, but we need not address this further because of our holding that Obert failed to plead a prima facie case involving a special relationship.

¶36 *Issue Three: Did the District Court err when it dismissed Obert's malicious prosecution claim?*

¶37 The District Court ruled that Obert's malicious prosecution claim failed as a matter of law because Swanson properly referred the issue to Lambert and therefore did not "instigate" the prosecution.[6] The District Court also held that, regardless of whether

---

[6] To prove a malicious prosecution claim, a plaintiff must prove that "(1) a judicial proceeding was commenced against the plaintiff; (2) the defendant was responsible for *instigating*, prosecuting, or continuing a judicial proceeding; (3) there was a lack of probable cause for the defendant's acts;

15

Swanson instigated the prosecution, he enjoys prosecutorial immunity and may not be held civilly liable for pursuing the claims.

¶38    Obert asserts the District Court erred in its finding that Swanson did not "instigate" the prosecution because it failed to accept her allegations to the contrary as true. Obert further contends that Swanson exceeded his statutory duty to "refer information" to the Attorney General when he did not "receive a complaint concerning official misconduct" in the first place. Rather, Obert alleges, Swanson gathered evidence of the alleged theft and misconduct on his own, persuaded the Commission to appoint Lambert as special prosecutor after several other prosecutors refused to do so, and quietly assisted the investigation thereafter.

¶39    The District Court did not err in determining that Swanson was acting within the scope of his statutory duties and was thus immune from prosecution when he referred the case to Lambert.

¶40    A prosecutor is absolutely immune from civil liability when acting within the scope of his duties. *Rosenthal v. Cnty. of Madison*, 2007 MT 277, ¶ 29, 339 Mont. 419, 170 P.3d 493 (citing *State ex rel. Dep't of Justice v. Dist. Ct.*, 172 Mont. 88, 92, 560 P.2d 1328, 1330 (1976); *Ronek v. Gallatin Cnty.*, 227 Mont. 514, 518–19, 740 P.2d 1115, 1118 (1987)). When determining whether a prosecutor is immune from malicious prosecution claims, our inquiry focuses on whether the prosecutor was acting within a "quasi-judicial" role,

---

(4) the defendant was actuated by malice; (5) the judicial proceeding terminated favorably for the plaintiff; and (6) the plaintiff suffered damage." *Spoja v. White*, 2014 MT 9, ¶ 12, 373 Mont. 269, 317 P.3d 153 (internal quotation omitted and emphasis added).

consistent with his statutory duties, rather than on whether the prosecutor had improper motives. *Rosenthal*, ¶ 30 (citing *Imbler v. Pachtman*, 424 U.S. 409, 429–30, 96 S. Ct. 984, 994 (1976)). Prosecutorial immunity helps to ensure that the public is not deprived of the benefit it enjoys from "officers exercis[ing] their functions unfettered by fear of legal consequences," but it "extends only to acts within the scope of the actor's jurisdiction and with the authorization of law." *Steele v. McGregor*, 1998 MT 85, ¶ 26, 288 Mont. 238, 956 P.2d 1364.

¶41 The threshold question here, therefore, is whether Swanson was acting in a quasi-judicial role, consistent with his statutory duties. County attorneys have prosecutorial duties, including to "institute proceedings before magistrates for the arrest of persons charged with or reasonably suspected of public offenses *when the county attorney has information* that the offenses have been committed." Section 7-4-2712(1), MCA (emphasis added).

¶42 Other relevant statutes provide that "[i]f a county attorney receives a complaint concerning official misconduct . . . of a local government public officer and the county attorney does not commence an action . . . the county attorney shall refer the complaint and any relevant evidence for the attorney general's review . . . ." Section 7-4-2718, MCA. Furthermore, "[t]he attorney general shall review a complaint referred from a county attorney concerning alleged misconduct of a local government public officer . . . ." Section 2-15-504, MCA. Finally, §§ 7-4-2705 and -2707, MCA, allows a county attorney to appoint another county attorney or other special counsel to perform criminal legal services upon agreement of the county commissioners.

¶43 Obert strains § 7-4-2718, MCA, to imply that a county attorney may not raise the "complaint" himself under the meaning of the above statutes. Whether Swanson made the complaint or received it from a third party is immaterial; the statute does not make that distinction.

¶44 Our role in interpreting a statute is "simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted." Section 1-2-101, MCA. We construe statutes so that they effectuate the Legislature's purpose in creating the law. *State v. Heath*, 2004 MT 126, ¶ 24, 321 Mont. 280, 90 P.3d 426.

¶45 The statutory language indicates the Legislature intended § 7-4-2718, MCA, to ensure that a county attorney follows up on complaints regarding official misconduct. The legislative history supports this interpretation. On the House floor, Representative Rob Cook introduced the bill as "provid[ing] a method for the attorney general to intervene in complaints against local elected officials . . . this is necessary because frequently a county attorney will decline to intervene because they actually work for the elected officials." *House Floor Vote on HB 422*, 65th Leg., Reg. Sess. (Mont. 2017) (bill sponsor introduction). Other than Sen. Brian Hoven's similar introduction on the Senate Floor, there was no further discussion regarding the bill before it passed both chambers with little opposition. We find it clear from the statutory language and limited legislative history that § 7-4-2718, MCA, was passed to ensure complaints regarding official misconduct are investigated and/or prosecuted and do not languish on county attorneys' desks. Additionally, § 7-4-2712, MCA, pertaining to general prosecutorial duties of a county

18

attorney, does not distinguish between information that a county attorney has come upon themselves or information provided to them by a third-party complaint.

¶46    In this case, Swanson referred evidence to Lambert supporting Obert's prosecution for violations of the Agreement. This was the appropriate course of action, given Swanson's potential conflict of interest and evidence that Obert had voted on matters involving her husband's employer, potentially in violation of the Agreement. Swanson appropriately referred the matter to the Attorney General and later passed "relevant evidence" along to Lambert according to § 7-4-2718, MCA.[7] While the statute does not speak specifically to whether a county attorney may initiate a complaint himself, interpreting it as such gives effect to the Legislature's intent to ensure that official misconduct is properly investigated and prosecuted, and it is otherwise consistent with a county attorney's statutory duties as described under Title 7, chapter 4, part 27, MCA. Further, Swanson's actions in seeking county commission approval for services of a special deputy county attorney were within his lawful statutory duties. Section 7-4-2707, MCA.

¶47    In *Rosenthal*, we held that a county attorney was immune from civil liability for malicious prosecution when he filed and maintained criminal charges against a defendant consistent with the "many duties of a prosecutor." *Rosenthal*, ¶ 29. The underlying logic was that a prosecutor's duties are quasi-judicial in nature and must be safeguarded in the

---

[7] While ¶ 75 n.4 of Justice Gustafson's Concurrence and Dissent notes that § 7-4-2718, MCA, was not in effect until July 2017, Obert's complaint asserts that Swanson initiated his communications with the Attorney General's office in August 2018 that culminated in the alleged malicious prosecution. Obert does not allege that Swanson's 2015 complaint that ended in the deferred prosecution agreement was improper. As such, this statute is an appropriate basis for his actions.

public interest. *Rosenthal*, ¶¶ 29–30. Although Swanson was not the prosecuting attorney here, there is no doubt that he acted in a quasi-judicial role by referring the case to Lambert, which is also among the "many duties of a prosecutor."

¶48 The implication of such a broad category of protection—the "many duties of a prosecutor"—necessarily begs the question: what actions by a county attorney would *not* be protected by prosecutorial immunity in malicious prosecution actions? Indeed, Obert has not identified a single successful malicious prosecution action against a prosecutor. While that fact alone does not resolve whether there are scenarios where such an action might be successful, it helps to isolate the reason why we have not recognized one.

¶49 Nor does Obert's complaint allege that Swanson became aware of the subject public record information he forwarded to Lambert by any means other than in the ordinary course of his official duties under § 7-4-2711(1), MCA. Obert does not allege any facts that suggest or imply Swanson was acting more like a police detective rather than acting within the scope of his prosecutorial discretion. Nor does any statute disqualify Swanson from following up on a prior prosecutorial referral made under his statutory duties.

¶50 Typically, malicious prosecution actions involve private parties who are not entitled to any form of immunity. *See generally Spoja*; *McAtee v. Morrison & Frampton, PLLP*, 2021 MT 227, 405 Mont. 269, 512 P.3d 235; *Seipel v. Olympic Coast Invs.*, 2008 MT 237, 344 Mont. 415, 188 P.3d 1027. When similar cases have been brought against prosecutors or the State, on the other hand, we have widely recognized prosecutorial or quasi-judicial immunity. *See generally State ex rel. Dep't of Justice*; *Steele*; *Rosenthal*; *Ronek*. We agree with the United States Supreme Court that to do otherwise would be to "qualify[] a

20

prosecutor's immunity [and] disserve the broader public interest" because it would "prevent the vigorous and fearless performance of the prosecutor's duty that is essential to the proper functioning of the criminal justice system." *Imbler*, 424 U.S. at 427–28, 96 S. Ct. at 993–94.

¶51 Individuals whose fundamental rights have been deprived are not left without recourse. As the *Imbler* Court opined, "a prosecutor stands perhaps unique, among officials whose acts could deprive persons of constitutional rights, in his amenability to professional discipline by an association of his peers." 424 U.S. at 429, 96 S. Ct. at 994. Likewise, criminal defenses and/or remedies may be available if a prosecutor or other official's actions are so egregious that they violate a claimant's fundamental rights. *See State v. Lawrence*, 2016 MT 346, ¶ 23, 386 Mont. 86, 385 P.3d 968 (granting relief for prosecutorial misconduct in violation of right to fair trial under the Sixth Amendment of the United States Constitution and Article II, Section 24, of the Montana Constitution); *see also Imbler*, 424 U.S. at 429, 96 S. Ct. at 994 (citing the "criminal analog" to 42 U.S.C. § 1983, 18 U.S.C. § 242); *O'Shea v. Littleton*, 414 U.S. 488, 503, 94 S. Ct. 669, 688 (1974) ("[W]e have never held that the performance of the duties of judicial, legislative, or executive officers, requires or contemplates the immunization of otherwise criminal deprivations of constitutional rights.").

¶52 Allowing individuals to pursue civil actions against county attorneys for referring suspected official misconduct to the attorney general would run afoul of § 7-4-2718, MCA, and potentially frustrate county attorneys from pursuing prosecutions in other matters.

21

Whether Swanson "instigated" the prosecution or not, he may not be held civilly liable for performing his statutory duties.

¶53     The District Court did not err in dismissing Obert's malicious prosecution claim based on the doctrine of prosecutorial immunity.

¶54     *Issue Four: Did the District Court err when it dismissed Obert's due process claim?*

¶55     Obert alleges the State violated her procedural due process rights under Article II, § 17, of the Montana Constitution by filing criminal charges against her and nullifying the Agreement without giving her notice or an opportunity for a pre-deprivation hearing.

¶56     The State counters that procedural due process simply required probable cause that Obert violated the Agreement in order to obtain leave to file an information, then an evidentiary hearing after the State charged her and she moved to dismiss. Thereafter, the State was required to prove that Obert breached the Agreement based on a preponderance of the evidence. The State contends all of these requirements—and thus Obert's procedural due process rights—were satisfied.

¶57     The District Court agreed with the State, finding that Obert failed to cite any precedent supporting her argument that she was entitled to a pre-deprivation hearing before the State could pursue charges against her with probable cause that she violated the Agreement.

¶58     Although Montana has recognized "pretrial diversions" since at least 1979, the statute governing them does not establish a procedure that must be followed to rescind an agreement pursuant to a breach. *See* § 46-16-130, MCA.

22

¶59    Other jurisdictions have held that the State bears the burden of proving by a preponderance of the evidence that a criminal defendant breached the terms of a deferred prosecution agreement, or a similar agreement, before it may "unilaterally revoke" it. *See Castaneda*, 162 F.3d at 836 n.20 (citing *United States v. Verrusio*, 803 F.2d 885, 888 (7th Cir. 1986); *United States v. Tarrant*, 730 F. Supp. 30, 32 (N.D. Tex. 1990)); *United States v. Packwood*, 848 F.2d 1009, 1012 (9th Cir. 1988)).   These decisions instruct, however, that it is proper for a court to make this determination *after* a criminal defendant has been charged but before they are convicted.

¶60    Obert cites no authority for the proposition that the State must make its case for breach of an agreement before it indicts a defendant.  As the State notes, all of the cases that Obert cites took place in criminal proceedings that asked whether respective convictions or sentences could be upheld after the State allegedly violated an agreement. *See Castaneda*, 162 F.3d at 833; *United States v. Meyer*, 157 F.3d 1067, 1077 (7th Cir. 1998); *Cuero v. Cate*, 850 F.3d 1019, 1023 (9th Cir. 2017); *United States v. Carrillo*, 709 F.2d 35, 37 (9th Cir. 1983); *United States v. Calabrese*, 645 F.2d 1379, 1390 (10th Cir. 1981).  None involved civil actions against the State for alleged due process violations.

¶61    In *Castaneda*, for example, a criminal defendant moved to dismiss charges, alleging the State violated an agreement for transactional immunity that provided that he would not be charged as long as he gave investigators leads and information to make a case against the "big fish."  *Castaneda*, 162 F.3d at 839.  A U.S. district court denied the defendant's motion to dismiss and he was convicted on the RICO conspiracy charges that led to his arrest.  *Castaneda*, 162 F.3d at 833–34.  The Ninth Circuit Court of Appeals reversed his

conviction, finding that he had satisfied his end of the bargain and the State had violated its own. *Castaneda*, 162 F.3d at 840. While the Ninth Circuit held that "due process prevents the government from making this determination and nullifying the agreement unilaterally," *Castaneda*, 162 F.3d at 836, it simply determined that the State had failed to prove "by a preponderance of the evidence" that the defendant violated the agreement, thus his conviction was unlawful. *Castaneda* did not, however, address the due process issue that Obert raises here.

¶62 The Seventh Circuit Court of Appeals squarely addressed the matter in *United States v. Meyer*, where a criminal defendant similarly argued that his drug convictions were unlawful because the State violated an immunity agreement. 157 F.3d 1067 (7th Cir. 1998). There was a pre-trial evidentiary hearing on the defendant's motion to dismiss, and the district court determined "that the government had more than met the required preponderance of the evidence standard in establishing [the defendant's] breach and denied [his] motion to dismiss." *Meyer*, 157 F.3d at 1072. On appeal, the defendant made essentially the same argument that Obert makes here: that he was entitled to a pre-indictment evidentiary hearing. *Meyer*, 157 F.3d at 1076. As Obert notes, the Seventh Circuit held that in the federal system the "preferred procedure . . . would be for the government to seek relief from its obligations under the immunity agreement prior to indictment." *Meyer*, 157 F.3d at 1077. What Obert fails to address, however, is that regardless of the "preferred procedure," the defendant's due process rights were not violated in *Meyer* because the issue was determined at the pretrial evidentiary hearing on his motion to dismiss. 157 F.3d at 1077.

¶63 Obert's due process rights were not violated. The State indicted her only after it obtained leave to file an information on probable cause. Then, the district court held a pretrial evidentiary hearing on Obert's motion to dismiss and *granted* her motion. The protection Obert was afforded by the Agreement was vindicated by the district court—the proper forum to determine whether either party breached. *Verrusio*, 803 F.2d at 888.

**CONCLUSION**

¶64 The District Court order dismissing Obert's breach of contract and good faith and fair dealing claims was error and is reversed because her claims were not time barred. The District Court's order dismissing Obert's bad faith claim was not error because the undisputed facts within the complaint failed to state a cognizable claim that she was in an unequal bargaining position when the deferred prosecution agreement was adopted. Obert's malicious prosecution claim against Swanson and her due process claim against the State were properly dismissed.

¶65 We affirm in part, reverse in part, and remand for proceedings consistent with this Opinion.

/S/ MIKE McGRATH

We Concur:

/S/ JIM RICE
/S/ BETH BAKER

Justice Ingrid Gustafson, concurring in part, and dissenting in part.

¶66    I concur with the Opinion as to issues 1 and 4.  I dissent as to issues 2 and 3. Regarding Issue 2, I believe the District Court erred in dismissing Obert's bad faith claim at this stage of the proceedings.  And as to Issue 3, I believe Obert set forth sufficient facts to withstand a motion to dismiss the malicious prosecution claim and the matter is better left for resolution during the summary judgment stage or at trial.

¶67    In Issue 2, the majority has determined Obert failed to plead a prima facie case demonstrating a special relationship, such that dismissal of her bad faith claim is appropriate.  The District Court reached this conclusion by inappropriately inserting facts into Obert's complaint, and the majority here creates bad law by making the same mistake.

¶68    This matter comes to us following the District Court's order granting the State's motion to dismiss.  Appellate review of such an order requires this Court to "construe a complaint in the light most favorable to the plaintiffs when reviewing an order dismissing a complaint under M. R. Civ. P. 12(b)(6)."  *McKinnon v. W. Sugar Coop. Corp.*, 2010 MT 24, ¶ 12, 355 Mont. 120, 225 P.3d 1221 (citing *Jones v. Mont. Univ. Sys.*, 2007 MT 82, ¶ 15, 337 Mont. 1, 155 P.3d 1247).  Motions to dismiss are "viewed with disfavor and rarely granted."  *Fennessy v. Dorrington*, 2001 MT 204, ¶ 9, 306 Mont. 307, 32 P.3d 1250. "Dismissal of an action is justified only when the allegations of the complaint clearly demonstrate that the plaintiff does not have a claim."  *Fennessy*, ¶ 9 (citing *Buttrell v. McBride Land & Livestock*, 170 Mont. 296, 298, 553 P.2d 407, 408 (1976)).

¶69    The District Court dismissed Obert's bad faith claim, finding she failed to demonstrate the "special relationship" needed under *Story* to obtain tort damages stemming

26

from a contract claim. The only contested element of the five-factor *Story* "special relationship" test here is the first: whether the parties were "in inherently unequal bargaining positions[.]" *Story*, 242 Mont. at 451, 791 P.2d at 776. In her amended complaint, Obert alleged that "[i]n entering the 2016 agreement, Laura and the State were in inherently unequal bargaining positions." The amended complaint also recounted that Swanson, as Broadwater County Attorney, asked DCI to investigate her; DCI did in fact investigate her upon Swanson's request; Obert hired an attorney to represent her during the investigation; DCI Agent Poppler submitted his report to the Attorney General's office, seeking prosecution of Obert for felony theft and misdemeanor official misconduct; that Brant Light, the Assistant Attorney General assigned to the case, drafted a deferred prosecution agreement after negotiating with Obert's attorney, which Obert signed; that Obert fully repaid the overpayment within two days of learning the calculated amount; and that, after she had already signed the agreement, the prosecutor informed both DCI Agent Poppler and the DCI Bureau Chief that he "[did]n't believe any criminal charges were appropriate" in the case.

¶70 Both the District Court and the majority latch on to Obert's status as a county commissioner as somehow relevant to the determination of whether the parties were bargaining on equal footing. It is not. At the time the parties entered into the deferred prosecution agreement, Obert was facing up to 10 years in prison if charged with felony theft. Section 45-6-301(8)(b)(i), MCA (2015). The State was the sole party with the power to determine whether Obert could be charged with the offense. It used that bargaining power to induce Obert to enter into a deferred prosecution agreement even though the

27

prosecutor did not believe any criminal charges were warranted in the case.[1] Any experience reviewing contracts Obert may have gained during her service as a county commissioner certainly could not prepare her for a negotiation in which the State threatened her with up to 10 years of imprisonment for actions which the State's own prosecutor did not believe constituted a crime.

¶71 Other states have taken the obvious step of recognizing "the unequal bargaining power of the parties in the context of plea agreements" because "[w]hen presented with evidence of criminal offenses punishable by imprisonment, prosecutors possess the sole authority to decide whether and whom to charge, the classification of the offense charged, and whether to offer a plea bargain." *State v. Smith*, 238 A.3d 1014, 1017-18 (N.H. 2020); *accord State v. Wroe*, 16 N.E.3d 462, 469 (Ind. Ct. App. 2014) ("It is always the case that there will be unequal bargaining power between an individual and the State[.]"); *State v. Robertson*, 468 P.3d 1217, 1222 (Ariz. 2020) ("[G]iven the unequal bargaining power between the state and a defendant, the latter is usually in no position to dictate that specific terms be included in plea agreements."); *Anthony v. State*, 329 P.3d 1027, 1032 (Alaska Ct. App. 2014) (explaining any ambiguities in a plea agreement must be construed against

[1] The district court in Obert's 2020 criminal case determined the time period of the deferred prosecution agreement was for up to 30 days and ended when Obert repaid Broadwater County for the overtime she was paid. The District Court here explicitly rejected the previous district court's reasoning and determined the time limit of the deferred prosecution agreement was indefinite and lasted for as long as Obert was a Broadwater County Commissioner. It is unnecessary to resolve this dispute between the district courts to determine whether the parties were in unequal bargaining positions when negotiating the 2016 deferred prosecution agreement. I would note, however, that Obert's only apparent contribution to the final agreement possibly resulting in a *longer* time period she was subject to its terms may lend credence to her assertion the bargaining power of the parties was unequal.

the State, "because the State is the party with the greater bargaining power."). *See also Anthony*, 329 P.3d at 1032 n.6 (collecting cases demonstrating that construing ambiguities in plea agreements against the government due to its status as the party with the greater bargaining power in negotiations "is considered well-settled law in most jurisdictions"). The majority here, instead, determines that, as a matter of law, the State— with the sole power to bring and dismiss charges against its citizens (even when, as the prosecutor here stated, in his own words, after inducing Obert to enter the deferred prosecution agreement, that he "[did]n't believe any criminal charges were appropriate")— and one of those citizens—who has been accused of a crime and has no power but to plead guilty or go to trial—are bargaining from inherently equal positions because that citizen was represented by counsel and signed stock language indicating she understood and agreed to the terms of the deferred prosecution agreement.[2] This conclusion defies both common sense and practical reality. *See, e.g., Missouri v. Frye*, 566 U.S. 134, 143-44, 132 S. Ct. 1399, 1407 (2012) (explaining the negotiation of a plea bargain is the critical point for a defendant because the criminal justice system in the United States is a "system of pleas, not a system of trials" when plea bargains account for approximately 95% of all criminal convictions).

¶72    In responding to this Dissent, and rather than addressing the nearly-unanimous conclusion of courts across this country that individuals bargaining with the government

---

[2] As I have previously noted, the stock assertion Obert signed indicating she "fully understands the terms and conditions of the agreement" is more than a little suspect when two separate district courts came to two very different conclusions on what exactly those terms and conditions were.

in criminal cases have far less power than the State, the majority unwittingly highlights the disparity in the bargaining power of the parties in this case. The Opinion now recounts that, even though Light did not believe criminal charges were warranted, Obert could still have been criminally charged if she did not agree to the deferred prosecution agreement. Opinion, ¶ 32. Obert's ability to reject a deferred prosecution agreement where the prosecutor did not believe any criminal charges were warranted and, in response, still be hit with felony charges with a possible 10-year incarceration is certainly not equal to the State's power to bring, or not bring, those charges in the first place. It makes little sense how recounting such an obvious power disparity can lead the majority to determine the parties were bargaining from inherently equal positions. The majority also falsely claims that the negotiations produced a "very favorable outcome" for Obert because "no criminal charges were filed against her[.]" Opinion, ¶ 32. The Opinion itself recounts how Obert was in fact criminally charged based on the underlying felony theft charge (the one Light believed did not even warrant any criminal charges) in 2019, years after she paid back Broadwater County for the overtime pay she was not entitled to,[3] based upon alleged violations of the deferred prosecution agreement. Opinion, ¶¶ 7-8. In my view, a delay of three years and then being hit with a felony charge for conduct the State's own prosecutor admitted did not constitute a crime does not constitute a "very favorable outcome" as alleged by the majority. And, in any event, Obert certainly does not allege she received a "very favorable outcome" in the deferred prosecution agreement, as the majority yet again

---

[3] Though it is also undisputed Obert did, in fact, actually work those overtime hours.

makes inappropriate factual findings against Obert at this stage of the proceedings rather than reviewing her complaint "in the light most favorable to" her as required. *McKinnon*, ¶ 12.

¶73 The allegations of Obert's amended complaint are more than enough, at this stage of the proceedings, "to state a cognizable claim that the parties were in an unequal bargaining position," Opinion, ¶ 33, and it should be allowed to go forward. Obert's complaint was only required to set forth "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" M. R. Civ. P. 8(a)(1). I believe it did so, particularly as "[o]ur cases reflect the principle that liberal rules of pleading allow for compliance with the spirit and intent of the law rather than a rigid adherence to formula or specific words." *McKinnon*, ¶ 17 (citation omitted). And, in any event, we "do[] not favor the short-circuiting of litigation at the initial pleading stage unless a complaint does not state a cause of action under any set of facts." *Tobacco River Lumber Co. v. Yoppe*, 176 Mont. 267, 271, 577 P.2d 855, 857 (1978). While I believe the allegations of Obert's complaint are more than enough to survive dismissal under our liberal pleading rules, at the very least, the factual record should have been allowed to develop in the due course of litigation as "further discovery may constitute an appropriate remedy for lack of specificity in a complaint." *McKinnon*, ¶ 17 (citing *Willson v. Taylor*, 194 Mont. 123, 128, 634 P.2d 1180, 1183 (1981)).

¶74 I believe Obert has pleaded sufficient facts to survive a motion to dismiss. Both the District Court and the majority here err by inappropriately making factual findings that exceed the scope of Obert's complaint at this stage of the proceedings and failing to

recognize the unequal bargaining power between the State—who possessed the power to charge Obert with a felony which could lead to 10 years of imprisonment—and Obert—who possessed the power to not take the State's deal and take her chances at trial. I dissent as to Issue 2.

¶75 Turning to Issue 3, I agree with the Opinion that merely making a referral to the Attorney General (AG) would not be sufficient for Obert to establish a claim for prosecutorial misconduct against Swanson. Obert, however, has asserted conduct of Swanson well beyond merely making a referral to the AG for investigation and potential prosecution. Obert alleges that once the referral was made and the AG's office had assigned a prosecutor, such that Swanson was not acting in any official capacity as a prosecutor and not protected by prosecutorial immunity,[4] Swanson continued to actively pursue, participate in, and direct the investigation even though an alternate prosecutor was formally assigned to investigate and, if warranted, prosecute any claim. Further, when the prosecutor assigned to the case refused to bring charges, Swanson, acting under no official capacity, refused to accept that determination and orchestrated the appointment of a different prosecutor—Lambert—and was instrumental in Lambert bringing charges against Obert and continuing the judicial proceeding when there was no probable cause to do so.

¶76 The five-year effort to prosecute Obert must be placed in proper context and with a correct legal interpretation of § 7-4-2718, MCA, and prosecutorial immunity. It must

---

[4] It is also noted that § 7-4-2718, MCA, under which Swanson asserts a duty to refer a complaint concerning official misconduct was not in effect until July 2017, and thus not applicable as a basis for his actions in referring the case to the AG.

32

initially be understood that Swanson could not prosecute Obert because, as a Broadwater County Commissioner, she was Swanson's client. Hence, Swanson had an irreconcilable conflict of interest in *acting as prosecutor* in any criminal offense against Obert. M. R. Pro. Cond. 1.7(a) provides: "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest." It can hardly be disputed that prosecuting a client is adverse to that client's interest. Thus, Swanson, because he could not prosecute the matter himself, referred the matter to Brant Light.

¶77    Section 7-4-2718, MCA, provides: "If a county attorney receives a complaint concerning official misconduct as provided in 45-7-401 of a local government public officer and the county attorney does not commence an action pursuant to 45-7-301(3), the county attorney shall refer the complaint and any relevant evidence for the attorney general's review as provided by 2-15-504 within 90 days of the receipt of the complaint." Pursuant to § 2-15-504, MCA, the attorney general shall review a "complaint referred from a county attorney" and "may instruct the county attorney . . . [relevant here] . . . [to] decline to prosecute the officer." Brant Light reviewed the information and determined that criminal charges were not warranted. No one contests that "[w]hen a defendant acts upon a statutory duty and provides information to the proper authorities, who then file criminal charges, that defendant is not liable for 'instigating' criminal proceedings." *White v. State ex rel. Mont. State Fund*, 2013 MT 187, ¶ 34, 371 Mont. 1, 305 P.3d 795. However, despite Brant Light determining that Obert did not have the intent to deceive anybody and that criminal charges were unwarranted, Swanson, as alleged by Obert, continued to provide evidence, information, and "referrals," and informed prosecutors he was "not willing to

33

drop" his complaints—in contravention to both his attorney-client obligations and going well beyond the language of § 7-4-2718, MCA. Obert alleges Swanson did not accept Brant Light's determination that a criminal prosecution was not warranted and continued to relentlessly pursue the filing of criminal charges. The act of "providing information to authorities *without more* is not actionable" in a malicious prosecution case. *Vehrs v. Piquette*, 210 Mont. 386, 391, 684 P.2d 476, 478 (1984) (emphasis added). However, whether prosecutorial immunity applies depends on the "nature of the function performed, not the identity of the actor who performed it." *Kalina v. Fletcher*, 522 U.S. 118, 127, 118 S. Ct. 502, 508 (1997) (citation omitted). A prosecutor's actions are not "absolutely immune merely because they are performed by a prosecutor." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273, 113 S. Ct. 2606, 2615 (1993). Here, Swanson could not function as a prosecutor without violating the Code of Professional Conduct. While a single, initial referral to the attorney general might be protected, Obert has alleged far more in her complaint describing both the functions Swanson performed and the nature of his actions. Section § 7-4-2718, MCA, does not automatically confer prosecutorial immunity. Although prosecutorial immunity is absolute and immunizes prosecutors from civil suits for prosecutorial actions, it must be in connection with the judicial function *of prosecuting a case*, which—here—Swanson could not do. *Renenger v. State*, 2018 MT 228, ¶¶ 9-10, 392 Mont. 495, 426 P.3d 559.

¶78    Further, § 7-4-2718, MCA, provides a procedure by which a complaint of official misconduct received by a county attorney may nonetheless be acted upon despite the county attorney declining to prosecute. The statutes' use of "shall," requiring the county

34

attorney to make a referral is telling, and is ill-suited factually to a situation where a county attorney who *wants* to prosecute, but cannot prosecute a defendant. Here, there are no factual allegations in the Amended Complaint that Swanson *received* a complaint of official misconduct. Obert contends that § 7-4-2718, MCA, is inapplicable under these facts and has alleged that Swanson is distorting and improperly using § 7-4-2718, MCA, to falsely create absolute prosecutorial immunity. Obert has alleged facts far beyond Swanson making an obligatory referral to the attorney general.

¶79 In her Amended Complaint Obert specifically asserted:

- After the AG's special prosecutor, Light, determined no criminal charges should actually be brought against Obert, Swanson continued to communicate with the AG's office demanding Obert be prosecuted and continued to gather evidence and search for some prosecutor who would take his evidence and criminally prosecute Obert.

- After prosecutor Light refused to bring criminal charges, Swanson asked the Fergus County Attorney, Kent Sipe, to investigate and make an independent prosecution decision regarding Swanson's complaints about Obert's conduct. After Mr. Sipe declined to prosecute Obert, Swanson continued to renew his demand that the AG's Office revoke Obert's deferred prosecution agreement and prosecute her.

- Swanson then, in essence, sidestepped the AG's Office and demanded the Broadwater County Commission (while Obert was away attending a work conference out of state) appoint a different county attorney to prosecute Obert. Swanson drafted the resolution for the commissioners identifying Obert as the target

of the investigation and prepared the notices for them to take action while Obert was away. Swanson did not tell the other commissioners that Mr. Sipe had also declined to prosecute Obert.

- After Swanson orchestrated the appointment of Lambert to prosecute Obert, Swanson "hand fed" Agent Poppler evidence he collected from Broadwater County financial records which he purported supported criminal charges against Obert.

- Obert alleges Agent Poppler's investigation did not reveal any breaches of the 2016 Agreement. Not did it reveal any improprieties regarding MBAC's involvement in the creation of Wheatland TEDD. Lambert's prosecution relied on the information Swanson provided and many of Lambert's allegations in his affidavit supporting the charges brought against Obert were alleged to be patently false.

- Obert also brought a malicious prosecution claim against Lambert which was ultimately settled.

¶80 In proceeding under a Rule 12(b)(6) motion to dismiss, these allegations must be accepted as true. In the event Obert is able to prove these allegations, she could sustain a malicious prosecution claim against Swanson. Obert has made sufficient allegations to withstand dismissal under Rule 12(b)(6) and this matter is better left for resolution at the summary judgment or trial stage of the litigation. Thus, I dissent as to issue 3.

/S/ INGRID GUSTAFSON

Justice Laurie McKinnon joins the Concurrence and Dissent of Justice Ingrid Gustafson.

/S/ LAURIE McKINNON

36

Justice Dirk Sandefur, dissenting in part and concurring in part.

¶81 I concur that the District Court correctly dismissed Obert's civil malicious prosecution claim against County Attorney Swanson pursuant to M. R. Civ. P. 12(b)(6) based on absolute prosecutorial immunity (Issue 3, *supra*). I further concur that the District Court also correctly dismissed Obert's constitutional due process violation claim against the State due to failure to state sufficient facts necessary to survive Rule 12(b)(6) scrutiny on the elements of the claim (Issue 4, *supra*). I dissent, however, from the Court's Issue 1 and 2 holdings which allow Obert's co-pled contract and contract-based tortious bad faith claims to proceed on the merits against the State. Rather than blindly follow the parties down the analytical garden path with narrow focus on whether Obert's contract claims against the State are time-barred, and whether her amended complaint is sufficient to sustain the special relationship element of her tortious bad faith claim against the State, I would recognize the obvious—all of the contract-based claims against the State are exclusively based on the alleged wrongful conduct of the involved State prosecutors acting on behalf of the State within the scope of their statutory authority, and are thus plainly precluded as a matter of law by prosecutorial immunity based on the express count-specific pleading of each claim. I would thus affirm the District Court's Rule 12(b)(6) dismissal of those claims, but on a right-result/wrong-reason basis as precluded as a matter of law by prosecutorial immunity.[1]

---

[1] Had it survived Rule 12(b)(6) scrutiny on the substantive elements of the claim, Obert's co-pled due process violation claim against the State would have been similarly barred by prosecutorial immunity in any event.

**FACTUAL AND PROCEDURAL BACKGROUND**

¶82 Obert's amended complaint distinctly pled six civil claims for compensatory damages against the State of Montana as a government entity, County Attorney Swanson, and Special Prosecutor Marty Lambert, to wit:

> (1) <u>Counts I-IV against the State</u> for:
>
> > (A) breach of express contract provision;
> >
> > (B) breach of the covenant of good faith and fair dealing implied by law as a term of every contract;
> >
> > (C) contract-based tortious bad faith (i.e., breach of the implied contract covenant of good faith and fair dealing in the context of a special relationship); and
> >
> > (D) tortious deprivation of liberty or property without procedural due process in violation of Mont. Const. art. II, § 17;
>
> (2) <u>Count V against County Attorney Swanson</u> for tortious malicious prosecution; and
>
> (3) <u>Count VI against Special Deputy County Attorney/Special Assistant Attorney General Lambert</u> for tortious malicious prosecution.

The amended complaint separately set forth a number of factual allegations common to all of the subsequently pled causes of action, to wit as pertinent:

> In 2015, Broadwater County Attorney Swanson referred to the "Attorney General's Office" for investigation and potential prosecution of then Broadwater County Commissioner Obert based on certain public record information upon which the County Attorney suspected that she had been unlawfully (1) claiming and receiving "a base salary in excess of the statutorily allowed" county commissioner salary, and (2) voting to approve various "measures involving" her husband's employer, a private non-profit business development company, "without disclosing potential conflicts of interest or recusing herself." When subsequently contacted by the Montana Department of Justice (MDOJ) investigator[2] assigned to the referral by the

---

[2] The Montana Department of Justice is a legal and law enforcement agency of the State of

38

Attorney General, the County Attorney provided copies of various county records which he believed manifested probable cause that Obert had committed the alleged criminal acts or omissions.[3]

Upon completion of his review of information provided by the County Attorney, the MDOJ investigator forwarded the case file to the involved Assistant Attorney General responsible for providing prosecutorial assistance to local prosecutors.[4] In lieu of prosecution, the Assistant Attorney General entered into a deferred prosecution agreement[5] with Obert, as negotiated with her counsel, which required her to:

(1)     repay a specified sum to the county for previously paid salary "in excess of her statutory" county commissioner salary;

(2)     comply with all statutory standards of conduct specified in §§ 2-2-101 through -144, MCA; and

(3)     "publicly disclose any and all possible conflicts of interests prior to participating in any official action" as a county commissioner including, *inter alia*, county administration of federal grant or tax increment district funding benefitting her husband's employer.

---

Montana under the supervision of the attorney general. *See* §§ 2-15-2001, 44-2-111, and -115, MCA (the statutory duties of state "agents" "appointed by the attorney general" include, *inter alia*, "provid[ing] investigative assistance to city, county, state, and federal law enforcement agencies at their request in accordance with rules adopted by the department of justice").

[3] As a matter of law, county commission proceedings, and records of those proceedings including agenda items and materials and meeting minutes regarding commission votes on action items, are proceedings and records open and available to the public except under certain narrow exceptions neither asserted, referenced, nor implicated on the amended complaint allegations at issue here. *See* Mont. Const. art. II, § 9; §§ 2-3-201, -202, -203, -212, and 2-6-1003(1), MCA (2015-21).

[4] *See* § 2-15-501(6), MCA.

[5] "Prior to the filing of a charge, the prosecutor and a defendant who has counsel . . . may agree to the deferral of a prosecution . . . on . . . conditions . . . that the defendant may not engage in specified activities [or] conduct," and pay "restitution in a specified manner for harm or loss caused by the [subject] offense." Section 46-16-130(1)(a)(ii) and (iv), MCA. "The prosecution must [then] be deferred for the period specified in the agreement *unless there has been a violation of its terms*." Section 46-16-130(1)(c), MCA (emphasis added). "The agreement must be terminated and the prosecution automatically dismissed with prejudice upon expiration and compliance with the terms of the agreement." Section 46-16-130(1)(d), MCA.

Obert timely repaid the county in full for the subject salary overage as required by the agreement.

In August 2018, County Attorney Swanson again contacted MDOJ and reported that he was aware of information indicating that Obert had breached her deferred prosecution agreement with the State by again "voting on measures concerning" her husband's employer in violation of various ethical statutes. Over "the following year," Swanson "arranged meetings with the Attorney General's Office" regarding his prosecutorial referral and "provided evidence" (i.e., county records) of "what [he] believed were [Obert's] breaches" of her deferred prosecution agreement.

While awaiting action from the "Attorney General's Office" on his referral, County Attorney Swanson asked the Fergus County Attorney "to investigate and make an independent prosecution decision" as to whether Obert had breached her deferred prosecution agreement, thereby allowing prosecution of that matter, and committed a new ethical offense as suspected by Swanson. However, the Fergus County Attorney ultimately "declined to prosecute."[6] County Attorney Swanson then "renewed" his earlier request for "Attorney General's Office" prosecution of Obert based on his MDOJ referral.

In the meantime, in July 2019, County Attorney Swanson requested and obtained county commission approval[7] for appointment of then Gallatin County Attorney Lambert as a Special Deputy Broadwater County Attorney "to review and make an independent prosecutorial decision" regarding the factual information upon which Swanson believed constituted a breach of Obert's deferred prosecution agreement and her subsequent commission of a new offense. The "Attorney General's Office followed suit" and then similarly appointed Lambert as a Special Assistant Attorney General "to investigate Swanson's complaint against" Obert. The MDOJ later assigned the original investigator involved in the 2016 salary overpayment matter to investigate whether Obert had since violated the terms of her 2016 deferred prosecution agreement. The County Attorney then again provide the MDOJ investigator with public county records which he believed supported his suspicions regarding Obert.

---

[6] The amended complaint did not allege or otherwise indicate whether the Fergus County Attorney had in fact been appointed a Special Deputy Broadwater County Attorney under §§ 7-4-2705 or -2707, MCA. It is thus unclear on the face of the amended complaint as to whether the Fergus County Attorney actually had any authority to exercise any independent prosecutorial power or discretion regarding an alleged Broadwater County offense.

[7] The amended complaint alleged that the County Attorney sought county commission approval for a special prosecutor while Obert was temporarily out of state.

In May 2020, based on his review of the MDOJ investigation,[8] and the county records provided by the County Attorney, Special Deputy County Attorney/Assistant Attorney General Lambert requested and obtained district court "leave to file an Information" charging Obert "with two crimes"—felony theft based on county salary "overpayment" which was the subject of the 2016 deferred prosecution agreement and misdemeanor official misconduct based on one or more post-2016 county commission votes that allegedly directly or indirectly financially benefitted her husband's employer.[9] The supporting affidavit filed by the special prosecutor alleged, *inter alia*, that Obert had breached her 2016 deferred prosecution agreement, thus freeing the State to prosecute her based on that subject matter.[10] The special prosecutor filed the motion, supporting affidavit, and charging Information in the name of the State of Montana as the prosecuting plaintiff.[11]

¶83 Based on those common factual allegations, Obert's amended complaint included the following claim-specific allegations central to each of her distinctly-pled claims, respectively:

(1)  breach of contract by the State as an entity: "the State breached the [deferred prosecution] [a]greement *by prosecuting* [Obert] for Count I Theft";

---

[8] The amended complaint alleged that the investigation conducted by the MDOJ investigator was limited to the alleged deferred prosecution violation, but the pertinent provisions of the 2016 deferred prosecution agreement, and Assistant Attorney General email, attached as exhibits thereto manifest that the terms of the deferred prosecution agreement required Obert to timely repay a specified county salary overage and prospectively refrain from county commission votes regarding the subject "Targeted Economic Development District," and associated tax increment district funding allocations, benefitting the subject private company which employed her husband.

[9] *See* §§ 46-11-101(3), -201(1)-(2), -401(1), and (4) MCA (procedural requirements for prosecutor-commenced state prosecution on district court leave to file charging Information on district court determination of "probable cause").

[10] In March 2021, the District Court dismissed the 2020 charges against Obert on the stated grounds that the terms of the 2016 deferred prosecution agreement precluded the State from subsequently prosecuting Obert on the 2016 salary overpayment issue, and that there was insufficient evidence to support the official misconduct charge absent proof that Obert or her husband financially gained from the post-2016 county commission vote(s) at issue.

[11] *See* § 46-11-401(1), MCA (criminal "charge must be in writing and in the name of the state"); *State v. Wilson*, 2007 MT 327, ¶ 25, 340 Mont. 191, 172 P.3d 1264 ("[a]n [I]nformation is a written accusation of criminal conduct prepared by a prosecutor in the name of the State").

(2)    breach of implied contract covenant of good faith and fair dealing by the State as an entity: "[t]he *State's actions*" as *set forth in the factual allegations common to all claims* "constitute a breach of the . . . covenant of good faith and fair dealing" implied in the "2016 Agreement";[12]

(3)    tortious bad faith by the State as an entity: "[t]he State breached its" implied contract "duty of good faith and fair dealing" by *prosecuting her*:

    (A)    despite knowing "that the prior prosecutor who entered the 2016 Agreement . . . did not believe" that the conduct at issue constituted "a crime";

    (B)    despite knowing that she "had repaid years earlier every cent she was overpaid in strict compliance with the 2016 Agreement"; and

    (C)    without "first seek[ing] a judicial determination that [she] breached the 2016 Agreement";

(4)    procedural due process violation by the State as an entity: the State "deprived" Obert of her "liberty" and "property interest[s] in the benefits" of the "2016 Agreement" *by* "unilaterally nullify[ing]" it to *prosecute her* regarding the subject of the agreement without a prior "hearing" and judicial determination that she in fact breached the agreement as alleged in the Information and supporting affidavit *filed by* the *Special Deputy County Attorney/Assistant Attorney General*;

(5)    malicious prosecution by the County Attorney: County Attorney Swanson "was responsible for" maliciously "*instigating*" the 2020 "*prosecution*" against her *without* "*probable cause*"; and

(6)    malicious prosecution by the Special Deputy County Attorney/Assistant Attorney General Lambert: Lambert maliciously "*instigate*[*d*]," "*commenced*," and "*prosecut*[*ed*]" Obert *without* "*probable cause*."

---

[12] As a matter of law under § 46-16-130(1)(a) and (c), MCA ("prosecutor and a defendant . . . may agree to the deferral of a prosecution" regarding the subject conduct on specified "conditions"), a matter of fact under the express language of the agreement, and by similar reference to the alleged State breach of the "2016 Agreement" under her tortious bad faith claim, Obert's implied contract covenant of good faith and fair dealing claim pertained to the State's express agreement, through the undersigned prosecutor, to refrain from thereafter *prosecuting* Obert regarding the conduct at issue.

42

Amended Complaint Counts I-VI (emphasis added). The District Court dismissed all of Obert's claims pursuant to M. R. Civ. P. 12(b)(6) (failure to state sufficient facts upon which cognizable legal relief may be granted). The court dismissed the malicious prosecution claims against the County Attorney and Special Deputy County Attorney/Assistant Attorney General based on absolute prosecutorial immunity. The court dismissed Obert's contract claims against the State (breach of express contract terms and breach of implied covenant of good and fair dealing) as time-barred by the one-year period of limitations specified by § 18-1-402, MCA. The court dismissed her contract-based tortious bad faith claim against the State based on failure to state specific facts to support the requisite "special relationship" element of a tortious bad faith claim. Obert does not contest the dismissal of her malicious prosecution claim against Special Deputy County Attorney/Assistant Attorney General Lambert. She appeals only the dismissal of her malicious prosecution claim against County Attorney Swanson, and her separate but derivative contract-based claims against the State based on the alleged wrongful conduct of the County Attorney and Special Deputy County Attorney/Assistant Attorney General.

**STANDARD OF REVIEW**

¶84 A civil claim for relief is subject to dismissal pursuant to M. R. Civ. P. 12(b)(6) if the originating complaint "either fails to state a cognizable legal theory" under which the requested relief may be granted, "*or . . . fails to state sufficient facts that, if true, would entitle the claimant to relief under that claim.*" *Anderson v. ReconTrust Co., N.A.*, 2017 MT 313, ¶ 8, 390 Mont. 12, 407 P.3d 692 (emphasis added). *See similarly Ryan v. City of Bozeman*, 279 Mont. 507, 511-13, 928 P.2d 228, 230-32 (1996) (claimant burden to

43

"adequately plead a cause of action"); *Mysse v. Martens*, 279 Mont. 253, 266, 926 P.2d 765, 773 (1996) (complaint must state factual basis for all elements of a cognizable legal claim); M. R. Civ. P. 8(a) (complaint must set forth a short and plain statement of a cognizable legal claim showing that the pleader is entitled to relief). While "all well-pled factual assertions" must be taken as true "in the light most favorable to the claimant," with "all reasonable inferences [drawn] in favor" thereof, the liberal standard of Rule 12(b)(6) review, and accompanying "liberal notice pleading requirements of M. R. Civ. P. 8(a)," "do not go so far to excuse omission of that which is material and necessary in order to entitle" the claimant to the requested "relief." *Anderson*, ¶ 8 (internal punctuation and citations omitted). Thus, a civil "complaint must state something more than facts which, at most, would breed only a suspicion that the claimant may be entitled to relief." *Anderson*, ¶ 8 (citations omitted, punctuation altered).

¶85 The question of whether an asserted claim is facially sufficient to survive Rule 12(b)(6) review is a question of law subject to plenary review de novo. *Anderson*, ¶ 7; *see also W. Sec. Bank v. Eide Bailly LLP*, 2010 MT 291, ¶ 18, 359 Mont. 34, 249 P.3d 35 (discretionary lower court rulings are subject to "plenary review" to the extent based on a conclusion or application of law—citing *Jacobsen v. Allstate Ins. Co.*, 2009 MT 248, ¶ 26, 351 Mont. 464, 215 P.3d 649). Moreover, we will affirm a lower court decision that reached a correct result even if based on a wrong or incorrect reason or rationale. *Mont. Democratic Party v. State*, 2020 MT 244, ¶ 6, 401 Mont. 390, 472 P.3d 1195; *Hudson v. Irwin*, 2018 MT 8, ¶ 12, 390 Mont. 138, 408 P.3d 1283; *Talbot v. WMK-Davis, LLC*, 2016 MT 247, ¶ 6, 385 Mont. 109, 380 P.3d 823; *Estate of Willson v. Addison*, 2011 MT 179,

44

¶ 29, 361 Mont. 269, 258 P.3d 410; *Cheff v. BNSF Ry. Co.*, 2010 MT 235, ¶ 37, 358 Mont. 144, 243 P.3d 1115; *Wells Fargo Bank v. Talmage*, 2007 MT 45, ¶ 23, 336 Mont. 125, 152 P.3d 1275; *Steadman v. Halland*, 197 Mont. 45, 52, 641 P.2d 448, 452 (1982). In other words, we will affirm a lower court decision that reaches a correct result regardless of the supporting rationale given for that result. *Jerome v. Pardis*, 240 Mont. 187, 192, 783 P.2d 919, 922 (1989) (citing *Shimsky v. Valley Credit Union*, 208 Mont. 186, 189-90, 676 P.2d 1308, 1310 (1984), and *Steadman*, 197 Mont. at 52, 641 P.2d at 452); *Phillips v. City of Billings*, 233 Mont. 249, 252, 758 P.2d 772, 774 (1988).

## DISCUSSION

¶86 Even a cursory examination of the express language of Obert's common and claim-specific amended complaint allegations clearly manifests that all of the claims at issue on appeal, whether the malicious prosecution claim against the County Attorney or the derivative contract and tort claims against the State, are *exclusively based* on the alleged wrongful conduct of the County Attorney and the Special Deputy County Attorney/Assistant Attorney General in initiating the 2020 prosecution of Obert regarding the subject of her 2016 deferred prosecution agreement and alleged subsequent criminal conduct. None of those claims are based on any complaint assertion that the County Attorney either acted outside the scope of his statutory authority as the state prosecutor in Broadwater County, or that he otherwise acted unethically or was ethically disqualified from encouraging either the Attorney General or the Special Deputy County Attorney/Assistant Attorney General to prosecute Obert on the asserted legal theories ultimately pled in the 2020 charging Information filed by the Special Deputy County

45

Attorney/Assistant Attorney General. Nor does Obert's complaint include any factual allegation that the County Attorney in any manner conducted himself as an independent criminal investigator or third-party witness in contrast to merely reviewing public county commission records and then referring them on to the criminal investigator assigned by the Attorney General upon referral from the County Attorney.[13] Consequently, Obert's amended complaint allegations are manifestly insufficient as a matter of law on Rule 12(b)(6) review to state any claim against the County Attorney or the State not barred as a matter of law by absolute or qualified prosecutorial immunity.

1. Absolute Prosecutorial Immunity.

¶87    Criminal prosecutors are absolutely immune from civil liability for acts or omissions committed in exercise of their prosecutorial duty, authority, or discretion when either acting or functioning as the government "advocate" in a judicial proceeding, or engaging in related activities or functions "intimately associated with," i.e., "closely related to," their function as the government "advocate" in the "judicial phase" of the criminal justice process. *Van de Kamp v. Goldstein*, 555 U.S. 335, 340-44, 129 S. Ct. 855, 859-62 (2009) (citations omitted); *Buckley v. Fitzsimmons*, 509 U.S. 259, 268-74, 113 S. Ct. 2606, 2613-16 (1993); *Burns v. Reed*, 500 U.S. 478, 494-95, 111 S. Ct. 1934, 1943 (1991) (absolute prosecutorial immunity is "concern[ed]" only with preventing "interference with" prosecutor "conduct closely related to the judicial process"—dispositive "inquir[y]

---

[13] Obert made that supplemental argument beyond the scope of her amended complaint allegations only in her subsequent briefing here and below.

[is] whether the prosecutor's actions are closely associated with the judicial process"); *Imbler v. Pachtman*, 424 U.S. 409, 430-31, 96 S. Ct. 984, 995 (1976).  *Accord Renenger v. State*, 2018 MT 228, ¶¶ 9-11, 392 Mont. 495, 426 P.3d 559; *Rosenthal v. Madison Cnty.*, 2007 MT 277, ¶¶ 27 and 30, 339 Mont. 419, 170 P.3d 493; *Ronek v. Gallatin Cnty.*, 227 Mont. 514, 516-17, 740 P.2d 1115, 1116-17 (1987); *State ex rel. Mont. Dep't of Justice v. Mont. Eighth Jud. Dist. Ct.*, 172 Mont. 88, 92, 560 P.2d 1328, 1330 (1976).  Absolute prosecutorial immunity is a common law doctrine based on recognition that a prosecutor is acting in a "quasi-judicial" capacity when acting within the scope of his or her duty as the government advocate in or incident to the judicial phase of the criminal justice process, and is thus entitled to absolute immunity based on the same public policy justifications which underly absolute judicial immunity.  *Rosenthal*, ¶ 27 (citation omitted); *Ronek*, 227 Mont. at 516-17, 740 P.2d at 1116; *Justice*, 172 Mont. at 90-93, 560 P.2d at 1329-30; *Van de Kamp*, 555 U.S. at 340-42, 129 S. Ct. at 859-60; *Imbler*, 424 U.S. at 420 and 422-28, 96 S. Ct. at 990-94.

¶88    When applicable to the type of prosecutor act or function at issue, *see supra*, absolute immunity applies regardless of whether the prosecutor acted negligently, dishonestly, maliciously, with improper or ulterior motive, without sufficient factual or legal basis for the subject action, or otherwise in violation or disregard of a statutory or constitutional duty or right.  *Renenger*, ¶¶ 10 and 22; *Rosenthal*, ¶¶ 26 and 29-30; *Ronek*, 227 Mont. at 516, 740 P.2d at 1116; *Justice*, 172 Mont. at 92, 560 P.2d at 1320; *Van de Kamp*, 555 U.S. at 340-43, 129 S. Ct. at 859-61 (absolute prosecutorial immunity "reflects a balance of evils" based on the public policy determination that "in the end" it is

"better . . . to leave unaddressed the wrongs done by dishonest [prosecutors] than to subject those who try to do their duty to the constant dread of retaliation"—internal punctuation and citation omitted); *Imbler*, 424 U.S. at 422-23 and 426-28, 96 S. Ct. at 991 and 993-94. In the case of a prosecutor's alleged violation or disregard of a legal duty or right owed to the subject of the act or conduct at issue, absolute immunity does not depend on whether the duty or right "was a positive" or affirmative duty or right "rather than a negative duty" or right. *Van de Kamp*, 555 U.S. at 343, 129 S. Ct. at 861 (noting that otherwise "a plaintiff can often transform a positive into a negative duty" or right "simply by" artful pleading— citing *Imbler*, 424 U.S. at 431 n.34, 96 S. Ct. at 995).

¶89    As particularly pertinent here, the quasi-judicial functions of prosecutors subject to absolute immunity are not limited only to the initiation of a prosecution and "courtroom" conduct, but also to out-of-court conduct that is closely-related to the "preparation" of a case "for the initiation of a prosecution" or conduct of other "judicial proceedings." *See Buckley*, 509 U.S. at 272-73, 113 S. Ct. at 2615 (citing *Imbler*, 424 U.S. at 430-31 n.33, 96 S. Ct. at 995). Such out-of-court prosecutorial acts or conduct subject to absolute immunity thus *inter alia* include:

(1)    the determination of whether probable cause exists to support a criminal charge;

(2)    the determination of whether and when to prosecute;

(3)    the determination of whether and when to file a misdemeanor complaint or seek leave of court to file a charging Information;

(4)    the determination of what or which witness testimony or other evidence to assert in support of a charge;

48

(5)     interview of independently identified witnesses to verify anticipated testimony;

(6)     review and assessment of externally available or gathered evidence; and

(7)     attesting on information and belief, rather than personal knowledge, as to the sufficiency of the asserted facts to establish probable cause to support the subject charge as required by law as a prerequisite to charging.[14]

*See Renenger*, ¶¶ 11, 13, 16-22, and 34; *Imbler*, 424 U.S. at 430-31 n.33, 96 S. Ct. at 995.

*See similarly Rosenthal*, ¶¶ 28-33; *State v. McWilliams*, 2008 MT 59, ¶ 29, 341 Mont. 517, 178 P.3d 121; *Ronek*, 227 Mont. at 518, 740 P.2d at 1117. Related out-of-court conduct subject to absolute quasi-judicial immunity as conduct "intimately associated with" a prosecutor's function as the government "advocate" in the "judicial phase of the criminal process" necessarily includes, *inter alia*, "questions of . . . whether to file a[] [charging] information, whether and when to prosecute, whether to dismiss [charges] against particular defendants, which witness" testimony "to call" or assert, "what other evidence to present," and "obtaining, reviewing, and evaluating . . . evidence" in "[p]reparation . . . for the initiation" or conduct "of the criminal process." *Imbler*, 424 U.S. at 430-31 n.33, 96 S. Ct. at 995. *Accord Renenger*, ¶¶ 13 and 21-22 (distinguishing prosecutor assertion of "probable cause . . . based upon [external] information provided . . . by others," rather than on "personal knowledge," as a quasi-judicial act of the government advocate and holding that prosecutor was "entitled to absolute prosecutorial immunity" when he "attested to *his belief* that . . . probable cause existed to initiate" a

---

[14] *See* §§ 46-11-101(3), -110, -201(1)-(2), -401(1), and (4), MCA (procedural requirements for prosecutor-commenced state prosecution on district court leave to file charging Information).

49

judicial prosecution "based upon . . . externally gathered information provided to him" "regardless of whether some portion" of the asserted information "was deficient or inaccurate"—emphasis added); *Buckley*, 509 U.S. at 273, 113 S. Ct. at 2615 (closely-related "acts undertaken by a prosecutor in preparing for the initiation" or conduct "of judicial proceedings," and thus "entitled to the protections of absolute immunity," necessarily "must include the professional evaluation of . . . evidence assembled by . . . police and appropriate preparation for its presentation" in the initiation or conduct of a judicial proceeding "after" the prosecutor had made "a decision to seek a[] [charging] indictment").

¶90    In contrast, even though within the lawful course and scope of prosecutorial duty or authority, other acts or conduct—which are neither taken or engaged-in by a prosecutor in or as part of the judicial phase of the criminal process, nor out-of-court conduct closely related to the evaluation or preparation of externally generated evidence in anticipation of commencement or conduct of a judicial proceeding—are functionally too attenuated from the quasi-judicial functions of a prosecutor, and thus not subject to absolute prosecutorial immunity.  *See Buckley*, 509 U.S. at 273-78, 113 S. Ct. at 2615-18; *Kalina v. Fletcher*, 522 U.S. 118, 121-27, 118 S. Ct. 502, 506-08 (1997); *Imbler*, 424 U.S. at 430-31 n.33, 96 S. Ct. at 995.  For example, such other acts or conduct of a prosecutor not subject to absolute quasi-judicial immunity include:  prosecutor conduct, guidance, or involvement in the preliminary "investigative work" traditionally performed by police "in order to decide whether" there is probable cause for an arrest or referral for prosecution, sworn personal attestation to the truth or falsity of evidentiary facts for the same purpose or to the same

extent as a non-party witness, and comments to the press or public regarding the status of an investigation or case. *Buckley*, 509 U.S. at 273-76, 113 S. Ct. at 2616-17 (prosecutor involvement in "conduct" of preliminary "investigative work . . . in order to decide whether" probable cause exists for charging or arrest is more akin to traditional police function than the advocacy function of a prosecutor regarding criminal judicial proceedings); *Burns*, 500 U.S. at 494-96, 111 S. Ct. at 1944-45 (provision of legal advice to police about how to proceed with a preliminary investigation prior to prosecutor probable cause assessment too attenuated from advocate evaluation and handling of externally generated information incident to prosecution decision or preparation for commencement or conduct of prosecution);[15] *Kalina*, 522 U.S. at 130, 118 S. Ct. at 509-10 (personal attestation to, or vouching for, the "truth or falsity" of evidentiary facts under "penalty of perjury" in the same manner or purpose as any other non-party witness too attenuated from prosecutor function as government advocate in the judicial process);[16]

---

[15] *But see Chicopee Lions Club v. Dist. Atty. for Hampden Dist.*, 485 N.E.2d 673, 676-77 (Mass. 1985) ("the better rule is that a prosecutor who is conducting an investigation of a particular criminal suspect for the purpose of gathering evidence in preparation for" a criminal prosecution "is engaged in quasi-judicial activity for the purpose of prosecutorial immunity"). Once a prosecutor "has focused his investigation on a specific suspect, and is directing the efforts of the police in regard to this investigation, he is no longer engaged in the routine investigative work which may be performed by a lay" police officer or other, but rather has "made the apparent decision to initiate a prosecution and is utilizing his skills as" a professional "advocate to prepare the State's case against the defendant." *Chicopee Lions Club*, 485 N.E.2d at 677. "This type of investigative activity by a prosecutor is sufficiently related to the judicial phase of the criminal process to warrant absolute immunity." *Chicopee Lions Club*, 485 N.E.2d at 677 (citing Note, *Delimiting the Scope of Prosecutorial Immunity from § 1983 Damage Suits*, 52 N.Y.U. L. Rev. 173, 199 (1977)).

[16] When required by law, however, a prosecutor's affidavit attestation to asserted evidentiary facts as the basis for an assertion of probable cause in support of leave to file a charging document or a request for issuance of a judicial warrant is a quasi-judicial act closely related to the advocacy role

*Buckley*, 509 U.S. at 277-78, 113 S. Ct. at 2618 (out-of-court "[c]omments to the media" too attenuated from pre-filing probable cause/prosecution evaluation or preparation for commencement or conduct of prosecution). *See also Imbler*, 424 U.S. at 430-31 n.33, 96 S. Ct. at 995 ("[a]t some point, and with respect to some decisions" a "prosecutor no doubt functions as an administrator rather than as an officer of the court" in the judicial phase of the criminal process).[17]

### 2. Qualified Prosecutorial Immunity.

¶91     Even when too attenuated from the quasi-judicial function of a prosecutor in or incident to the judicial phase of the criminal process to qualify for absolute prosecutorial immunity, an act or conduct of a prosecutor otherwise within the scope of his or her duty or discretion is still protected from civil liability and suit unless the act or conduct violated a "clearly established statutory or constitutional right" of the claimant of which a reasonably competent prosecutor "would have known." *Rosenthal*, ¶¶ 34-35 (citing *Losleben v. Oppedahl*, 2004 MT 5, ¶ 13, 319 Mont. 269, 83 P.3d 1271 (federal citations

---

of the prosecutor regarding criminal judicial proceedings, and thus subject to absolute prosecutorial immunity. *See Renenger*, ¶¶ 9-22 (distinguishing circumstances at issue in *Kalina*). *See also, e.g.*, §§ 46-11-101, -110, -201(1)-(2), and -401(1)-(4), MCA (prosecutor-instituted misdemeanor complaint and felony Information charging procedure).

[17] However, even an "administrative obligation" is subject to absolute immunity if of "a kind that itself is directly connected with" the conduct of judicial proceedings and the performance or satisfaction of which "require[s] legal knowledge and the exercise of related discretion" by the prosecutor. *Van de Kamp*, 555 U.S. at 344-48, 129 S. Ct. at 862-64 (holding that absolute immunity applied to alleged tortious failure of supervisory prosecutor to (1) adequately supervise or train subordinate deputy prosecutors to ensure compliance with an affirmative constitutional duty of pretrial disclosure of evidence, and (2) establish and properly manage a "trial-related" inter-office "information system" to avoid constitutional prosecutorial trial error).

omitted)); *Buckley*, 509 U.S. at 268, 113 S. Ct. at 2613 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982)); *Harlow*, 457 U.S. at 817-18, 102 S. Ct. at 2738 ("government officials performing discretionary functions[] generally are shielded from [civil] liability" to the extent the subject "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known"). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 815 (2009). Qualified immunity "applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson*, 555 U.S. at 231, 129 S. Ct. at 815 (citation omitted, punctuation altered). Qualified immunity thus generally "provides ample protection to all" prosecutors except for those who are "plainly incompetent" or "knowingly violate the law." *Burns*, 500 U.S. at 494-95, 111 S. Ct. at 1944 (citation omitted).

¶92 Like absolute immunity, moreover, qualified immunity is "an immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S. Ct. 2806, 2815 (1985). Qualified immunity is thus "effectively lost if a case is erroneously permitted to go to trial." *Mitchell*, 472 U.S. at 526, 105 S. Ct. at 2815. Questions regarding the applicability of qualified immunity must therefore be "resolv[ed] . . . at the earliest possible stages of litigation." *Pearson*, 555 U.S. at 231-32, 129 S. Ct. at 815 (citation omitted). When qualified governmental immunity is at issue, the claimant has "the initial

burden" of showing as a matter of law that the "contours of the [subject] right" were "sufficiently clear" at the time to have reasonably informed the subject official that the conduct at issue would violate a particular constitutional right. *Sweaney v. Ada Cnty.*, 119 F.3d 1385, 1388-89 (9th Cir. 1997) (citing *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039 (1987)). For purposes of Rule 12(b)(6), the complaint must thus state "more than general conclusory allegations" that the defendant "violated" a statutory or constitutional right, but rather, "*particular facts*" sufficient, if true, to demonstrate a violation of a particular constitutional or statutory right that was "clearly established" at the time. *Sweaney*, 119 F.3d at 1388-89 (citation omitted). *Accord Rosenthal*, ¶¶ 35-36 (holding that county attorney had qualified immunity from malicious prosecution claim where plaintiff neither "allege[d], nor [did] the record reveal, the violation of any constitutional right by virtue of" the alleged conduct at issue); *Mitchell*, 472 U.S. at 526, 105 S. Ct. at 2815 (government officer "entitled to dismissal" of compensatory civil claim due to qualified immunity "[u]nless the [complaint] allegations" are facially sufficient to "state a claim of violation of clearly established" statutory or constitutional law).[18] On

---

[18] *See similarly Anderson*, ¶ 8 ("claim is subject to [Rule 12(b)(6)] dismissal if, as pled, it is insufficient to state a cognizable claim entitling the claimant to relief"). While "all well-pled factual assertions" must be taken as true and viewed "in the light most favorable to the claimant" with "all reasonable inferences [drawn] in favor [there]of," the claim is subject to Rule 12(b)(6) dismissal "if it either fails to state a cognizable legal theory for relief *or . . . fails to state sufficient facts that, if true, would entitle the claimant to relief under that claim.*" *Anderson*, ¶ 8 (emphasis added). *See also Ryan*, 279 Mont. at 511-13, 928 P.2d at 230-32 (claimant burden to "adequately plead a cause of action"); *Mysse*, 279 Mont. at 266, 926 P.2d at 773 (complaint must state factual basis of all elements of a cognizable legal claim); M. R. Civ. P. 8(a) (complaint must set forth a short and plain statement of a cognizable legal claim showing that the pleader is entitled to relief). The liberal standard of Rule 12(b)(6) review, and accompanying "liberal notice pleading requirements of M. R. Civ. P. 8(a)," "do not go so far to excuse omission of that which is material and necessary in order to entitle relief"—"the complaint must state something more than facts

Rule 12(b)(6) review of a civil claim implicating qualified governmental immunity, the court may either focus on "whether the [pertinent] facts . . . alleged" in the complaint "make out a violation of a constitutional right," or whether the alleged statutory or constitutional "right at issue was clearly established" as a matter of law "at the time of [the] alleged misconduct," whichever is more dispositive in a particular case. *Pearson*, 555 U.S. at 231-43, 129 S. Ct. at 815-22 (abandoning mandatory "two-step sequence" specified in *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001), "for resolving . . . qualified immunity claims").

3. Rule 12(b)(6) Application of Absolute and Qualified Prosecutorial Immunity to Obert's Direct Tort Claim Against County Attorney Swanson.

¶93 Montana law clearly defines the broad course and scope of the legal duty and authority of each county attorney as the primary state prosecutor in each county, to wit in pertinent part:

> Section 7-4-2712, MCA: "The *county attorney* is the *public prosecutor* and shall: (1) institute proceedings . . . for the arrest of persons charged with or *reasonably suspected of* public offenses *when* the county attorney *has information* that the *offenses have been committed*," and "(2) draw all [criminal] indictments and [I]nformations."

> Section 7-4-2716(1), MCA: "The *county attorney* shall . . . *conduct*, *on behalf of the state*, *all prosecutions* for public offenses and *represent the state* in all matters and proceedings to which it is a party."

(Emphasis added.) Moreover, upon authorization of the board of county commissioners, a county attorney may appoint *another county attorney* "to perform . . . criminal legal

---

which, at most, would breed only a suspicion that the claimant may be entitled to relief." *Anderson*, ¶ 8 (internal punctuation and citations omitted).

55

services" to assist the county attorney in the performance of his or her statutory duty and exercise of accompanying statutory authority. Section 7-4-2707, MCA. "The board of county commissioners may" similarly "employ or authorize the *county attorney* to employ *special counsel to assist* in the *prosecution of any criminal case*" in that county. Section 7-4-2705, MCA (emphasis added). The Legislature has further empowered the State Attorney General to oversee, and even directly assist, *county attorneys* in the performance of any matter "pertaining to . . . the duties of their offices," to wit:

> Section 2-15-501(5), MCA: The *attorney general* has the "duty . . . to exercise *supervisory powers* over *county attorneys* in all matters pertaining to the duties of their offices[,] . . . includ[ing] the power to order and direct county attorneys in all matters pertaining to the duties of their office."

> Section 2-15-501(6), MCA: "[W]hen required by the public service," the *attorney general* has the "duty . . . *to assist* the *county attorney* of any county in the discharge of the county attorney's duties *or to prosecute* . . . appropriate cases in which the state . . . is a party."

(Emphasis added.)

¶94 Within that broad statutory framework, *all* of the acts and conduct alleged in Obert's amended complaint allegations to have been committed by County Attorney Swanson fell squarely within the authorized course and scope of his statutory authority including, *inter alia*: (1) reviewing Obert's 2016 deferred prosecution agreement; (2) reviewing public records regarding Obert's pertinent county commission voting record for compliance therewith; (3) concluding, however erroneously or maliciously, that her subsequent county commission voting record materially violated the terms of the deferred prosecution agreement thus relieving the State of its obligation to refrain from prosecuting her alleged

56

prior theft of county salary overages;[19] (4) concluding, however erroneously or maliciously, that probable cause existed for the prior alleged theft and a subsequent criminal violation of a related statutory ethical rule; (5) seeking prosecutorial assistance from the Attorney General as a discretionary matter of preference due to the statutory and local political relationship of the county attorney to the board of county commissioners; (6) alternatively seeking county commission approval for prosecutorial assistance from another county attorney in the event the Attorney General failed to act; (7) renewing and following-up his request(s) for prosecutorial assistance from the Attorney General; and (8) specifying and forwarding the public record documentary basis for his prosecutorial assistance requests to the Attorney General. *See* §§ 7-4-2712, -2716(1), -2705, -2704, and 2-15-501(5)-(6), MCA.

¶95 As to the source of the public information and records which the County Attorney believed evidenced criminal activity by Obert in her official capacity and function as a county commissioner, "[t]he county attorney is the legal advisor of the *board* of county commissioners" and "shall" thus "attend their meetings when required," "*oppose all claims and accounts against the county* that are *unjust* or *illegal*," "defend all suits against *the county*," and "give[] when required . . . an opinion in writing to *the county*" and other specified "county . . . officers on matters relating to their respective offices." Section 7-4-2711(1) and (2)(a), MCA (emphasis added). Moreover, as a matter of law, county

---

[19] *See* § 46-16-130(1)(c), MCA ("prosecution" of an offense which is the subject of a deferred prosecution agreement "must be deferred for the period specified in the agreement *unless there has been a violation of its terms*"—emphasis added).

commission proceedings, and records of those proceedings including agenda items and materials and meeting minutes regarding commission votes on action items, are proceedings and records open and available to the public except under certain narrow exceptions neither asserted, referenced, nor implicated on the amended complaint allegations at issue here. *See* Mont. Const. art. II, § 9; §§ 2-3-201, -202, -203, -212, and 2-6-1003(1), MCA (2015-21). Within that legal framework, Obert's amended complaint does not allege that County Attorney Swanson became aware of the subject public record information by any means other than in the ordinary course of his official duties under § 7-4-2711(1), MCA. Nor is there any amended complaint allegation, or responsive assertion to the subsequent Rule 12 motion to dismiss the malicious prosecution claim against the County Attorney, even suggesting or implying that Swanson was somehow acting more like a police detective in ferreting out sufficient evidence for an arrest or prosecution prior to a prosecutorial determination of probable cause, rather than squarely within in the scope of his prosecutorial discretion under §§ 7-4-2712, -2716(1), -2705, -2704, and 2-15-501(5)-(6), MCA, regarding public information externally generated and known to him in the course and scope of his official duty.[20]

¶96 Moreover, nothing in §§ 7-4-2712, -2716(1), -2705, -2704, and 2-15-501(5)-(6), MCA, expressly or implicitly disqualifies or otherwise precludes a county attorney from

---

[20] In addition to the extensive express factual allegations included therein, attached as exhibits to Obert's amended complaint were copies of Obert's 2016 deferred prosecution agreement with the State, through Assistant Attorney General Brant Light, as well as a July 2016 email from the Assistant Attorney General regarding the 2016 "Obert Investigation" referencing the essential facts pertinent to the county salary theft and county commission voting conflict matters then at issue and which were the subjects of the 2016 deferred prosecution agreement.

following up with the Attorney General, another county attorney, or special prosecutor regarding the status of a prior prosecutorial referral made by the county attorney to that person. There is similarly nothing in the civil duties of the county attorney under § 7-4-2711, MCA, which as a matter of law gave rise to any disqualifying conflict of interest between County Attorney Swanson and County Commissioner Obert because a county attorney's pertinent civil duties under § 7-4-2711(1), MCA, are in pertinent part owed to the "*board* of county commissioners" and the "county"—not to individual county commissioners. *See* § 7-4-2711(1), MCA. Nor do Obert's amended complaint allegations, or her response to the Rule 12 motion to dismiss her malicious prosecution claim against the County Attorney, expressly or implicitly include any such assertion of fact or law.

¶97 Read in the light most favorable to the claim for purposes of M. R. Civ. P. 12(b)(6), the express gravamen of her malicious prosecution claim against County Attorney Swanson *is only* that he "was responsible for" maliciously "*instigating*" the 2020 "*prosecution*" against her *without* "*probable cause.*" (Emphasis added.) Taken as true in the light most favorable to the claim, Obert's amendment complaint allegations manifest that the alleged wrongful "instigati[on]" of the 2020 "prosecution" by County Attorney Swanson consisted of:

(1) his *professional assessment* in his official capacity *as the local state prosecutor*—however ill-advised, inaccurate, negligent, maliciously motivated, or in bad faith—*that probable cause existed* in 2018, based on public record information regarding Obert's post-2016 county commission voting conduct (i.e., alleged failure to adequately disclose an alleged financial conflict of interest), *for prosecution* of Obert for:

(A) her alleged theft of county salary overages at issue in 2016 (based on the *County Attorney's legal theory* that her post-2016 voting conduct

59

constituted a breach of the 2016 deferred prosecution agreement thus allowing belated prosecution of the alleged theft); and

    (B)    a related but independent criminal violation of a statutory ethical rule based on the same post-2016 county commission voting conduct;

(2)    his *referral of the case*, and follow-up requests, *for* review and *discretionary prosecution* by the Attorney General, as authorized under § 2-15-501(6), MCA;

(3)    later *providing* the *supporting public record information* regarding Obert's post-2016 county commission voting conduct, *upon which he based his assessment of probable cause* for prosecution, *when* later *contacted by* the investigator assigned by the *Attorney General* regarding *the referral for prosecution*;

(4)    his successive separate *referrals of the case for* review and *discretionary prosecution*, first by the Fergus County Attorney and then by Gallatin County Attorney Lambert, as authorized by §§ 7-4-2705 and/or -2707, MCA; and

(5)    his *request for* county commission *authorization for appointment* of Gallatin County Attorney Lambert *to prosecute* the case *as a Special Deputy* Broadwater *County Attorney*, as authorized by §§ 7-4-2705 and/or -2707, MCA.

Thus, for purposes of absolute prosecutorial immunity, the County Attorney's alleged wrongful conduct was not only well within the course and scope of his statutory duty and authority as the state prosecutor, but also "closely" and "intimately" related to a traditional quasi-judicial function of all prosecutors—the commencement of criminal court proceedings *after* prosecutor evaluation of the externally generated available information and determination of the existence of probable cause to proceed with a prosecution. *See Renenger*, ¶¶ 13 and 21-22 (distinguishing prosecutor assertion of "probable cause . . . based upon information provided . . . by others," rather than on "personal knowledge," as a quasi-judicial act of the government advocate and holding that prosecutor

was "entitled to absolute prosecutorial immunity" when he "attested to *his belief* that . . . probable cause existed to initiate" a judicial prosecution "based upon . . . externally gathered information provided to him" "regardless of whether some portion" of the asserted information "was deficient or inaccurate"—emphasis added); *Buckley*, 509 U.S. at 273, 113 S. Ct. at 2615 (closely-related "acts undertaken by a prosecutor in preparing for the initiation" or conduct "of judicial proceedings," and thus "entitled to the protections of absolute immunity," necessarily "must include the professional evaluation of . . . evidence assembled by . . . police and appropriate preparation for its presentation" in the initiation or conduct of a judicial proceeding "after" the prosecutor had made "a decision to seek a[] [charging] indictment"); *Imbler*, 424 U.S. at 430-31 n.33, 96 S. Ct. at 995 (out-of-court conduct subject to absolute quasi-judicial immunity as conduct "intimately associated with" prosecutor function as government "advocate" in the judicial process necessarily includes, *inter alia*, "obtaining, reviewing, and evaluating . . . evidence" in "[p]reparation . . . for the initiation of the criminal process," and "whether and when to prosecute" or "file a[] [charging] information"). *Compare Buckley*, 509 U.S. at 273-76, 113 S. Ct. at 2616-17 (prosecutor involvement in "conduct" of preliminary "investigative work" "in order to decide whether" probable cause exists for charging or arrest is more akin to traditional police function than the advocacy function of a prosecutor regarding criminal judicial proceedings); *Burns*, 500 U.S. at 494-96, 111 S. Ct. at 1944-45 (provision of legal advice to police about how to proceed with a preliminary investigation prior to prosecutor probable cause assessment too attenuated from advocate evaluation and handling of externally generated information incident to prosecution

61

decision or preparation for commencement or conduct of prosecution); *Kalina*, 522 U.S. at 130, 118 S. Ct. at 509-10 (personal attestation to, or vouching for, the "truth or falsity" of evidentiary facts under "penalty of perjury" in the same manner or purpose as any other non-party witness too attenuated from prosecutor function as government advocate in the judicial process). The fact that he referred and delegated the matter to the Attorney General or a Special Deputy County Attorney/Assistant Attorney General to serve as the actual assigned prosecutor is not akin to the non-prosecutorial function of an investigating police officer or complaining witness, nor does Obert's amended complaint include any such claim-specific, or even common, complaint allegation. I therefore concur with the Majority that the District Court correctly dismissed Obert's malicious prosecution claim against County Attorney Swanson based on absolute prosecutorial immunity.

¶98 Even if Obert's complaint allegations could be liberally construed to allege that he acted in some manner that was *not* closely related to the quasi-judicial function of commencing a prosecution for purposes of absolute immunity, a characterization clearly belied by Obert's narrow claim-specific complaint allegation that he was "responsible for instigating" the subject "prosecution," the County Attorney in any event would still have qualified immunity from civil suit and liability under Obert's limited complaint allegations as in *Rosenthal*, for example. In *Rosenthal*, a malicious prosecution claimant alleged that a Montana county attorney did not have absolute quasi-judicial immunity regarding a criminal prosecution commenced and conducted by the Attorney General, on referral from the county attorney who sought Attorney General assistance based on "a perceived conflict of interest" based on the fact that the alleged victim was a local public defender and the

county attorney's "belie[f]" that the defendant/claimant already "held a grudge" against the county attorney's office resulting from a prior prosecution. *Rosenthal*, ¶¶ 11-12 and 33. The claimant asserted that quasi-judicial immunity further did not apply based on the county attorney's advice to the sheriff about how to proceed with the investigation of the "complaints" against the claimant received by the sheriff after he forwarded them to the county attorney "for a determination about how to proceed." *Rosenthal*, ¶ 32. After completing his investigation accordingly, the sheriff forwarded the resulting information to the county attorney who "in turn sent the file to the Attorney General's Office for further handling," with a request for "review" and prosecution of "any charges . . . deemed viable." *Rosenthal*, ¶ 33. In holding that the county attorney was, "at the very least," "entitled" to qualified immunity, we noted that the:

(1) county attorney "properly handed the case off to the Attorney General" based on his concern that his "further participation could be perceived as a conflict" of interest;

(2) county attorney "may have encouraged the Attorney General to prosecute the case" but that the Attorney General made "the ultimate decision" to do so;

(3) county attorney thus neither "instigate[d]," nor "prosecute[d]" the case; and

(4) claimant in any event did "not allege," much less demonstrate, the "violation of any constitutional right" resulting from the county attorney's conduct.

*Rosenthal*, ¶¶ 33-36 (thus affirming grant of M. R. Civ. P. 56 dismissal of the claim). Likewise here, except for Obert's amended complaint allegation that the County Attorney "gather[ed]" the public record evidence regarding her pertinent county commission voting record, and the lack of any complaint allegation that the County Attorney in any way advised the investigator assigned by the Attorney General how to proceed with the

63

investigation and evidence gathering, the pertinent circumstances at issue here on Rule 12(b)(6) review are virtually identical to those at issue in *Rosenthal*.

¶99 Moreover, there is no well-pled amended complaint allegation sufficient to conceivably lead to a conclusion or discovery of evidence that, even if tortious as alleged, the County Attorney's conduct constituted or resulted in a violation of a particular and clearly established constitutional or statutory right under the alleged circumstances of this case. The Court effectively so holds under Issue 4. Opinion, ¶¶ 55-63 (essentially holding that the District Court properly dismissed Obert's Mont. Const. art. II, § 17, due process claim because there is no clearly established constitutional or statutory right to a pre-charge hearing and judicial determination of an asserted predicate breach of a deferred prosecution agreement). Thus, even if, *arguendo*, Obert's amended complaint allegations could be reasonably construed to allege County Attorney conduct *not* closely-related to a prosecutor's quasi-judicial function for purposes of absolute immunity, the County Attorney would still have qualified immunity from Obert's malicious prosecution claim as a matter of law in any event.

4. Application of Prosecutorial Immunity to Obert's Entity Contract and Tort Claims Against the State.

¶100 When sued as a separate named-defendant on a civil claim based on an allegedly wrongful act or omission committed by a duly-authorized prosecutor on its behalf, the subject state or local government entity is generally protected by absolute and qualified prosecutorial immunity, as applicable, to the same extent as the subject prosecutor. *Renenger*, ¶¶ 9 and 34 (citing *Justice* and *Ronek*); *Rosenthal*, ¶¶ 5, 25, 36, and 46-47 (citing

*Ronek* re absolute prosecutorial immunity and *Koppen v. Bd. of Medical Examiners*, 233 Mont. 214, 220, 759 P.2d 173, 176 (1988), re qualified prosecutorial immunity); *Ronek*, 227 Mont. at 516-20, 740 P.2d at 1116-18; *Justice*, 172 Mont. at 92-93, 560 P.2d at 1330.[21] Because absolute and qualified prosecutorial immunity are separate and distinct common law doctrines based on different policy justifications than sovereign immunity, neither Mont. Const. art. II, § 18 (abolishing sovereign immunity), nor §§ 2-9-102 or -305(1)-(2), MCA (Montana Tort Claims Act provision subjecting state and local governments to tort liability but providing statutory immunity to employees acting within the course and scope of their employment), abolished or limited continued application of the well-established common law doctrines of absolute prosecutorial immunity and qualified immunity. *Rosenthal*, ¶¶ 24-25; *Ronek*, 227 Mont. at 516-17, 740 P.2d at 1116; *Justice*, 172 Mont. at 91-93, 560 P.2d at 1330-31. The policy justification for extending absolute and qualified prosecutorial immunity to the state or local government entity on behalf of which the

---

[21] *Accord Christoffersen v. State*, 242 P.3d 1032, 1036 n.26 (Alaska 2010). This extended application of absolute or qualified prosecutorial immunity is in essence a context-specific exception to the general common law principle of vicarious liability of the employing or supervising entity for the tortious conduct of a subject employee or subordinate committed while acting in the course and scope of the subject employment. *See Brenden v. City of Billings*, 2020 MT 72, ¶ 13, 399 Mont. 352, 470 P.3d 168 ("[d]*istinct from direct liability* for an employer's own tortious conduct, the common law doctrine of *respondeat superior* imposes vicarious liability on employers for the tortious conduct of employees committed while acting within the scope of their employment"); Restatement (Third) of Agency § 7.03(1)(a)-(b) and (2). However, regardless of a prosecutor's absolute or qualified immunity as an individual, the subject state or local government entity is not protected by absolute or qualified prosecutorial immunity if the entity is a separately named defendant, and the prosecutor committed the subject prosecutorial act or omission as required by a policy or custom independently imposed by the employing or supervising entity. *See Ronek*, 227 Mont. at 516-20, 740 P.2d at 1116-18.

subject prosecutor was acting in a representative capacity is the same as for providing such immunity to the subject prosecutor individually in the first instance, to wit:

> [t]he public policy which requires immunity for the prosecuting attorney, also requires immunity for both the state and the county for [the] acts of . . . [those] officers in the performance of the duties which rest upon them[.] [O]therwise, the objectives sought by immunity to the individual officers would be seriously impaired or destroyed. If the prosecutor must weigh the possibilities of precipitating tort litigation involving the county and the state against his action in any criminal case, his freedom and independence in proceeding with criminal prosecutions will be at an end. The public advantage of free, independent, and untrammeled action by the prosecuting attorney outweighs the disadvantage to the private citizen in the rare instance where he might otherwise have an action against the county and state, either or both. The doctrine must encompass the state and its agencies, as well as the prosecutor, or its efficacy will be lost.

*Justice*, 172 Mont. at 92-93, 560 P.2d at 1330 (quoting *Creelman v. Svenning*, 410 P.2d 606, 608 (Wash. 1966)).

¶101 Unfortunately, however, we have inexcusably fouled our heretofore well-settled prosecutorial immunity jurisprudence with an anomalous, uncommonly flawed, and patently result-oriented opinion denying the State of Montana prosecutorial immunity for the allegedly wrongful, but manifestly quasi-judicial, filing and conduct of a criminal judicial proceeding by a state prosecutor. *See McDaniel v. State*, 2009 MT 159, 350 Mont. 422, 208 P.3d 817. At issue in *McDaniel* was whether the State of Montana had absolute entity prosecutorial immunity from compensatory civil claims—breach of contract and resulting breach of contract based tortious denial of due process—based solely on a deputy county attorney's filing and prosecution of a probation revocation petition predicated on an admitted violation of the claimant's suspended criminal sentence. *McDaniel*, ¶¶ 2-3, 5-8, 9-10, and 12. In 2003, the claimant admitted to cocaine use in violation of his

66

probation after testing positive upon a random drug test administered by his supervising state probation officer. *McDaniel*, ¶¶ 2-3. In lieu of filing a district court report of violation which would have triggered a county-attorney-filed probation revocation proceeding in accordance with §§ 46-23-1011(1), -1012(2), (3)(c), (4)-(5), 46-18-203(1)-(2), and (5)-(7), MCA (2001), the supervising probation officer instituted an administrative Montana Department of Corrections (DOC) "intervention hearing" proceeding pursuant to §§ 46-23-1012(3)(b) and -1015, MCA (2001). *McDaniel*, ¶¶ 3-4. The administrative intervention hearing process then ultimately terminated in a post-hearing diversionary agreement under which the probationer agreed to an increased level of DOC probation supervision for six months, and related behavioral programing conditions, in return for the agreement of his supervising probation officer to not alternatively file a "formal [report of] violation" under § 46-23-1012(3)(c) and (4), MCA (2001). *McDaniel*, ¶¶ 3-4.[22]

¶102 However, upon "informally" "learn[ing]" that DOC had administratively disposed of the admitted probation violation under §§ 46-23-1012(3)(b) and -1015, MCA (2001), a Deputy Flathead County Attorney "obtained" the administrative DOC case file from the Regional DOC Probation and Parole Division Director and then later filed a formal

---

[22] The purpose of the "informal probation violation intervention hearing" process was "to gain the probationer's compliance with the conditions of probation without a formal revocation hearing" in district court "under 46-18-203." Section 46-23-1015(1), MCA (2001). Within the framework of the "informal . . . intervention hearing" process, the post-hearing diversionary agreement was thus an informal alternative administrative disposition in lieu of the discretion of the DOC "hearings officer" to impose a 30-day period of incarceration as a statutorily authorized administrative sanction upon a "preponderance of the evidence" determination of a probation violation. *See* § 46-23-1015(3), MCA (2001). Unlike the statutory deferred prosecution agreement at issue here, the post informal intervention hearing diversionary agreement at issue in *McDaniel* was not expressly authorized by statute.

probation revocation petition against the probationer pursuant to § 46-18-203, MCA (2001), based on the "same probation violation" administratively disposed of by DOC through its earlier informal intervention hearing process diversionary agreement with the probationer. *McDaniel*, ¶ 5. Following his arrest and pre-dispositional incarceration pending revocation hearing, the probationer filed two motions to dismiss in the criminal case—one asserting that equitable claim preclusion (res judicata) procedurally barred the subsequent probation revocation proceeding vis-à-vis the prior administrative intervention hearing disposition, and the other asserting that the prosecutor's filing of the subsequent probation revocation proceeding constituted a breach of the prior administrative intervening hearing process diversionary agreement therefore apparently entitling the probationer to specific performance against the State, through the prosecutor, of the probation officer's contract agreement to refrain from filing a report of probation violation. *See McDaniel*, ¶ 6. In response, the State, through the county attorney, asserted that res judicata did not apply because "the State," through the county attorney, was not a party to the administrative intervention hearing proceeding and agreement, and was thus not bound thereby. *McDaniel*, ¶ 7. In the context of the limited arguments presented, the district court granted the probationer's motions to dismiss on the stated grounds that the prior intervention hearing diversionary agreement was a valid and enforceable contract between the State, through the supervising DOC probation officer, which by its terms thus precluded the State, through its local prosecutor, from thereafter petitioning for revocation of the

68

probationer's suspended sentence based on the same probation violation. *See McDaniel*, ¶ 7.[23]

¶103   Over 14 months later, the probationer asserted compensatory civil claims—breach of contract and contract-based tortious denial of due process—solely against the State as an entity. *McDaniel*, ¶ 8. However, the asserted claims were exclusively based only on the county attorney's filing and prosecution of the petition for judicial revocation and resentencing of the probationer under § 46-18-203, MCA. *See McDaniel*, ¶¶ 3-8. Pursuant to *Ronek*, 227 Mont. at 517-20, 740 P.2d at 1116-18 (affirming Rule 12(b)(6) dismissal of

_____

[23] As matters of contract and related agency law, the district court correctly recognized that the State is a non-corporal corporate entity which, as a matters of law and fact, could act only through its authorized agents or employees. *See McDaniel*, ¶¶ 6-7. Due to the stunted legal arguments presented by the parties, and failure to apply any critical analysis thereto, the district court not only failed to recognize the actual legal problem implicated, but then, even in context of the analytical approach taken, further failed to consider the thornier agency questions of whether the probation officer acting under the administrative DOC probation supervision and sanction authority of §§ 46-23-1012(2), (3)(b), and -1015, MCA (2001), had sufficient actual or apparent agency authority to contractually bind the State, independently acting through the county attorney, from filing and prosecuting a probation revocation proceeding under § 46-18-203(1)-(2) and (5)-(7), MCA (2001). Aside from the county attorney's manifest zealous motivation to punish the probationer for the same compliance-based violation more harshly than the more lenient informal manner elected by the probation officer, the fundamental legal problem was that the county attorney blatantly disregarded the larger statutory scheme set forth in §§ 46-23-1012, -1015, and 46-18-203, MCA (2001), and thereby subjected the probationer to non-constitutional double jeopardy in contravention of the mutually exclusive informal and formal probation violation sanction options so manifestly intended and expressly specified by the Legislature. *See* §§ 46-23-1012(2), (3)(b), and -1015, MCA (informal administrative sanction process); *compare* §§ 46-23-1012(2), (3)(c), (4)-(5), 46-18-203(1)-(2), and (5)-(7), MCA (2001) (formal probation revocation and resentencing on probation violation). Thus, the more direct and correct legal resolution would have been for the district court to construe §§ 46-23-1012(2), (3)(b), and -1015, MCA (informal DOC administrative intervention hearing process), and §§ 46-23-1012(2), (3)(c), (4)-(5), 46-18-203(1)-(2), and (5)-(7), MCA (2001) (county attorney discretion to petition for probation revocation and resentencing on probation violation), consistently, with effect to both, as mutually exclusive alternative remedies for sanctioning probation violations provided as consistent component parts of the larger statutory probation supervision and sanction scheme provided in §§ 46-23-1011(1), -1012(2), (3)(b)-(c), (4)-(5), -1015, 46-18-203(1)-(2), and (5)-(7), MCA (2001).

entity malicious prosecution and § 1983 federal civil rights violation claims asserted solely against Gallatin County based only on alleged wrongful prosecution of ultimately-dismissed misdemeanor theft charge), the district court accordingly granted M. R. Civ. P. 56 summary judgment to the State based on absolute prosecutorial immunity. *McDaniel*, ¶ 10. Incredibly, however, we reversed on the stated ground that "the State has provided no basis in law or in fact" upon which "to assert, much less prevail," based on prosecutorial immunity regarding "McDaniel's breach of contract and procedural due process claims." *McDaniel*, ¶¶ 25 and 51. As aptly exposed contemporaneously by Justice Rice in dissent, we did so based on a cascading sequence of dubiously flawed, analytically disingenuous fictions and distinctions explicable only by our manifest disapproval of the prosecutorial conduct at issue. *See McDaniel*, ¶¶ 15-25 (Nelson, J.—Cotter, Leaphart, and Morris, concurring); *compare McDaniel*, ¶¶ 55-58 (Rice, J., dissenting—Warner, J., concurring in dissent) (noting that Majority "constructed a complicated" and "analytically" "flawed" "framework to reach conclusions which embrace the facts" favorable to the desired result "and then turn[ed] [away] from the reality of those [same] facts"). Without need for elaboration, Justice Rice's dissenting analysis remains as objectively unassailable, and undeniably correct in 20/20 hindsight as it was 15 years ago.

¶104 However, review of the anomalous travesty of *McDaniel* is warranted to expose the similar travesty that should be, but is not, at issue here. As a threshold matter, *McDaniel* did not expressly or implicitly overrule, or even limit, our prior recognition in *Rosenthal*, *Ronek*, and *Justice* that the state or local government entity which the subject prosecutor represents as an agent, or is employed by, is protected by prosecutorial immunity to the

same extent as the prosecutor whose allegedly wrongful conduct is at issue. *See Rosenthal*, ¶¶ 25, 36, and 46-47 (citing *Ronek* re absolute prosecutorial immunity and *Koppen*, 233 Mont. at 220, 759 P.2d at 176, re qualified prosecutorial immunity); *Ronek*, 227 Mont. at 517-20, 740 P.2d at 1116-18 (citing *Justice*); *Justice*, 172 Mont. at 92-93, 560 P.2d at 1330; *compare McDaniel*, ¶¶ 17-20. Rather, we merely sidestepped that long-settled principle based on a series of unsupported legal fictions and irrelevant distinctions. *See McDaniel*, ¶¶ 14-25.

¶105 As a threshold matter, we first correctly noted that the State could not assert prosecutorial immunity unless it "first establish[ed] that the Deputy County Attorney could raise prosecutorial immunity as a defense to McDaniel's claims *if they were brought against him*." *McDaniel*, ¶ 20 (emphasis added). We then relied, however, on the false, misleading, and unsupported assertions that, since the lawsuit and claims at issue were filed only against the State, and that McDaniel had "no factual or legal basis . . . to bring his contract-based claims against the Deputy County Attorney," there was "no possible occasion for the prosecutor to assert prosecutorial immunity to McDaniel's claims" and thus "no basis for the State to extend such immunity to itself." *McDaniel*, ¶ 20. In a word, our reasoning was simply absurd, however, because the issue in a prosecutorial immunity case is not whether the claimant could have asserted a particular type of compensatory civil claim against the prosecutor in the first instance, but, assuming so, whether the claimant is seeking compensatory damages against the principal State or local government entity based on the alleged wrongful conduct committed by the prosecutor on behalf of the state within the scope of the type of immunity at issue, whether absolute or only qualified. *See*

*Rosenthal*, ¶¶ 25, 36, and 46-47 (citing *Ronek* and *Koppen*, *supra*); *Ronek*, 227 Mont. at 517-20, 740 P.2d at 1116-18 (citing *Justice*); *Justice*, 172 Mont. at 92-93, 560 P.2d at 1330. Otherwise, a claimant could easily defeat absolute and qualified prosecutorial immunity, and thereby reach into the public purse of the government principal on whose behalf the prosecutor was acting, simply through artful pleading—which is exactly what happened in *McDaniel*, and now again with Obert here.[24]

¶106  Seemingly recognizing our own patently flawed reasoning, we then invented and relied on the fantastical fiction that:

> McDaniel's claims . . . are not premised on any notion that the prosecutor's act of filing the petition for revocation was wrongful in itself[,] . . . [but] [r]ather . . . on the alleged *failure* of the *State itself* to perform the terms of its alleged contract with McDaniel. . . .  The State cites no authority for the proposition that the doctrine of prosecutorial immunity permits the State to avoid its contractual obligations.

*McDaniel*, ¶¶ 21-22 (emphasis added).  Our nonsensical reasoning was of course belied by the obvious indisputable point of fact and law that the State and its political subdivisions, as non-human and non-corporal entities, can only act through their employees and agents. As we had earlier recognized, the State prosecutor who allegedly breached the State's contractual agreement, was the State's prosecutorial agent acting on behalf of the State. *See McDaniel*, ¶¶ 5, 8, and 15.[25]  Equally contradictory to our rationale, the State did in

---

[24] Moreover, as contemporaneously noted by Justice Rice, our assertion that there was "no factual or legal basis" upon which McDaniel could have joined the prosecutor as party to the breach of contract claim was similarly specious and demonstrable false.  *See McDaniel*, ¶ 57 (Rice, J., dissenting) (citing *Crystal Springs Trout Co. v. First State Bank*, 225 Mont. 122, 129, 732 P.2d 819, 823 (1987) ("an agent is jointly and severally liable with his principal to third parties for wrongful acts committed in the course of his agency")).

[25] *See also* § 7-4-2716(1), MCA ("county attorney shall . . . conduct, *on behalf of the state*, all

72

fact cite to applicable legal authority supporting the proposition that it had no contractual liability under these circumstances, we just chose to ignore it. *See McDaniel*, ¶¶ 16-17 (noting State's assertion of prosecutorial immunity pursuant to *Ronek*, 227 Mont. at 516, 740 P.2d at 1116, and *Justice*, 172 Mont. at 92, 560 P.2d at 1330). Thus, as contemporaneously noted by Justice Rice, we erroneously concocted "a complicated," "analytically" "flawed" "framework to reach" a desired "conclusion[]" based on disingenuously distorted facts which then contradicted the legal and factual "reality" at issue. *See McDaniel*, ¶¶ 55-56 (Rice, J., dissenting).

¶107 Finally, if those disingenuous legal and factual justifications were not enough, we completed the trifecta by analogizing § 18-1-404(1)(a), MCA (2003) (waiving State sovereign immunity to contract liability[26]), to Mont. Const. art. II, § 18 (waiving State sovereign immunity to tort liability), to then conclude that it would be "incongruous" to allow prosecutorial "immunity as a defense to [the] alleged express contract" breach at issue. *McDaniel*, ¶ 23. However, we have long and consistently recognized, even after

---

prosecutions for public offenses and represent the state in all matters and proceedings to which it is a party"—emphasis added); § 7-4-2712, MCA ("county attorney is the public prosecutor and shall . . . institute proceedings . . . for the arrest of persons . . . reasonably suspected of public offenses when the county attorney has information that the offenses have been committed"); § 46-11-401(1), MCA (criminal "charge must be in writing and *in the name of the state*"— emphasis added); *McWilliams*, ¶ 29 ("county attorneys . . . are charged with a duty to conduct, *on the State's behalf*, all prosecutions for public offenses"—"[i]n discharging that duty, a county attorney has broad discretion to determine whether to prosecute an offender and what offense to charge"—emphasis added).

[26] *See Peretti v. State*, 238 Mont. 239, 243-45, 777 P.2d 329, 332-33 (1989) (noting that Mont. Const. art. II, § 18, waived State sovereign immunity only as to tort liability in contrast to § 18-1-404(1), MCA, which waived State sovereign immunity to "express contract" liability but not liability arising from "implied contracts").

*McDaniel*, that neither Mont. Const. art. II, § 18, nor § 2-9-305(1), MCA (Montana Tort Claims Act), abolished or otherwise limited the common law absolute and qualified immunity of State and local governments for allegedly wrongful conduct committed by their employees or agent prosecutors on their respective behalfs. *Renenger*, ¶¶ 9 and 34; *Rosenthal*, ¶¶ 24-25 (citing *Koppen*, 233 Mont. at 220, 759 P.2d at 176; *Ronek*, 227 Mont. at 517-19, 740 P.2d at 1116-17; and *Justice*, 172 Mont. at 92, 560 P.2d at 1330); *Storch v. E. Mont. Region 5 Mental Health Ctr.*, 169 Mont. 176, 179-80, 545 P.2d 644, 646-47 (1976); *Justice*, 172 Mont. at 91-92, 560 P.2d at 1329-30 (citing *Storch*, 169 Mont. at 179-80, 545 P.2d at 646-47). *Accord Ronek*, 227 Mont. at 516-20, 740 P.2d at 1116-18. We thus ignored that the similar general language of § 18-1-404(1), MCA, was no more sufficient to waive the State's prosecutorial immunity to contract-related claims alleging prosecutorial misconduct than Mont. Const. art. II, § 18, or § 2-9-305(1), MCA (Montana Tort Claims Act), were sufficient to waive the absolute and prosecutorial immunity of the State and local governments based on the alleged tortious conduct of prosecutors acting on their behalfs. As unequivocally recognized in *Renenger*, *Rosenthal*, *Ronek*, and *Justice*, *supra*, absolute and qualified prosecutorial immunities apply by their respective terms to all "civil liability claims" based on the alleged wrongful prosecutorial conduct—not just tort claims. Though *McDaniel* cited *Rosenthal*, *Ronek*, and *Justice*, without reference to that inconvenient fact, we sidestepped the inconvenient holdings of those cases by asserting that "we need not resolve" the assertion that "th[ose] cases" were either "not on point or" should be "reexamine[d]" because:

74

> [t]he Deputy County Attorney is not a named defendant to McDaniel's contract-based claims . . . [and] neither of [his breach of contract or due process violation] claims could be brought against the Deputy County Attorney, given that he was not a party to the contract that McDaniel claims was breached. Thus, . . . there being no possible occasion for the prosecutor to assert prosecutorial immunity to McDaniel's claims, there is no basis for the State to extend such immunity to itself.

*McDaniel*, ¶ 24.

¶108 Even we have since disregarded *McDaniel*, by omission, as an impediment to application of prosecutorial immunity protection of the State and employing county government when sued for civil liability based on wrongful conduct allegedly committed by a county attorney in the scope of his or her prosecutorial authority. *See Renenger*, ¶¶ 7-22 and 34. I would thus squarely overrule *McDaniel*, ¶¶ 14-20, as a patently erroneous anomaly and blight on our otherwise well-settled prosecutorial immunity jurisprudence.

¶109 *McDaniel* is in any event clearly distinguishable here even if not overruled. Unlike in *McDaniel*, the subject prosecutors who actually committed the wrongful acts at issue here—County Attorney Swanson and Special Deputy County Attorney/Assistant Attorney General Lambert—were named co-defendants in Obert's amended complaint. Nor does this case involve the more complicated State liability theory, based on the inconsistent conduct of its probation and prosecutorial agents, as at issue in *McDaniel*. Moreover, Special Deputy County Attorney/Assistant Attorney General Lambert has now prevailed on the basis of absolute prosecutorial immunity based on a district court ruling not contested by Obert on appeal, as should County Attorney Swanson *and* the State for the above-stated reasons. On those bases alone, *McDaniel* is in any event distinguishable here based on the primary lynchpin upon which this Court held the State liable for the allegedly

wrongful conduct of the State prosecutor involved there. *See McDaniel*, ¶¶ 15-25. *McDaniel* is thus of no consequence here in any event.

**CONCLUSION**

¶110   I recognize that the Majority's issue statements, and corresponding analyses, track the stunted manner in which this case was litigated below, and thus again here. I therefore understand the Majority's resulting reluctance to *sua sponte* apply prosecutorial immunity to Obert's entity claims against the State, whether by squarely overruling or merely distinguishing *McDaniel*. However, Obert's briefing citations to *McDaniel*, and her strikingly similar amended complaint claims against the State, clearly manifest that those isolated entity claims against the State were carefully modeled upon our patently erroneous analysis in *McDaniel*. I thus cannot silently standby while the derivative claims against the State go forward when they so obviously are barred as a matter of law by prosecutorial immunity, whether absolute or qualified, and thus could and should have been summarily dismissed pursuant to M. R. Civ. P. 12(b)(6). Taking Obert's amended complaint allegations as true as required under Rule 12(b)(6), I acknowledge that the filing and prosecution of the 2020 criminal case against Obert was clearly an abuse of prosecutorial discretion for which the Attorney General, County Attorney Swanson, and Special Deputy County Attorney/Assistant Attorney General Lambert are all responsible. However, as a matter of law, the Court is nonetheless stuck under Rule 12(b)(6) with the facially deficient gravamen of the claims pled in Obert's amended complaint vis-à-vis the clearly applicable absolute and qualified judicial immunity of the County Attorney, Special Deputy/Assistant Attorney General, and thus the State as their principal. We often, as is perfectly permissible

76

under our right-result/wrong-reason doctrine, affirm lower court judgments based on legal analyses not asserted, litigated, relied-on, or even considered below. If there was ever a case to apply that long-settled doctrine in the interests of justice, this is the one.

¶111 Instead, the Majority's adherence to the stunted presentation of this case, in disregard of clearly applicable dispositive law, implicitly perpetuates our patently erroneous analysis in *McDaniel*, and thus further fouls our heretofore well-settled and time-honored doctrine of prosecutorial immunity, a doctrine of far more legal and public policy import to the administration of justice in Montana than the alleged prosecutorial misconduct at issue here. Nonetheless, if nothing else, this dissent may provide food for thought when the legitimacy of our patently erroneous *McDaniel* analysis is eventually disputed by the parties, whether under M. R. Civ. P. 56 (summary judgment) on remand in this case, or before this Court in another case.

¶112 In the meantime, I concur with the Majority on Issues 3 and 4 (affirming Rule 12(b)(6) dismissal of Obert's malicious prosecution claim against the County Attorney and due process violation claim against the State), but dissent on Issues 1 and 2 (reversing Rule 12(b)(6) dismissal of Obert's entity contract and tort claims against the State). On a right-result/wrong-reason basis, I would instead hold on Issues 1 and 2 that the District Court correctly dismissed Obert's co-pled compensatory contract and tort claims against the State pursuant to Rule 12(b)(6), regardless of the reasons given.

/S/ DIRK M. SANDEFUR